Theresa M. WEST, Plaintiff,

v.

AETNA LIFE INSURANCE COMPANY, Defendant.

No. C 99–4114–MWB.

United States District Court, N.D. Iowa, Western Division.

Nov. 7, 2001.

Michael R. Mundt of Mundt, Franck & Schumacher, Denison, IA, for Plaintiff.

Sarah J. Kuehl of Heidman, Redmond, Fredregill, Patterson, Plaza, Dykstra & Prahl, Sioux City, IA, for Defendant.

**MEMORANDUM OPINION AND ORDER REGARDING TRIAL ON THE MERITS ON WRITTEN SUBMISSIONS**

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ............................................................. 860
 A. Findings Of Fact ...................................................... 860
 1. The crash .......................................................... 860
 2. Post-mortem analysis ............................................. 860
 3. The benefit plan ................................................... 861
 4. Denial of West's claim ............................................. 861
 B. Procedural Background ................................................ 864

II. LEGAL ANALYSIS .......................................................... 865
 A. Review Of Benefits Determinations Under ERISA ..................... 865
 1. Deferential review ................................................. 866
 a. Review of plan interpretation ................................. 866
 b. Review of factual determinations .............................. 866
 c. The deferential review applicable here ........................ 867
 i. "Interpretation" or "evaluation of the facts" in the parties' arguments ................................................ 867
 ii. Blurring in the case law ................................... 868
 2. "Less deferential" review .......................................... 870
 a. When "less deferential" review is appropriate ................ 870
 b. Plaintiff's grounds for "less deferential" review ............. 871
 i. Conflict of interest ....................................... 871
 ii. Procedural irregularity ................................... 873
 c. The appropriate degree of deference .......................... 874
 B. Application Of The Five–Factor Test .................................. 875
 1. Aetna's definition of "accident" ................................... 875
 2. Consideration of the definition in light of the Finley factors ..... 877
 a. Conflict with ERISA ......................................... 878
 i. Arguments of the parties .................................. 878
 ii. Rules of interpretation for ERISA plans .................. 878
 iii. "Ordinary" meaning of "accident." ....................... 880
 iv. Federal decisions defining "accident" for purposes of ERISA plans ............................................. 880
 v. Consistency of Aetna's definition with Wickman .......... 886
 vi. Consistency with New York common law ................... 888
 b. Consistency with goals of the Plan ........................... 891
 c. Internal inconsistencies ...................................... 893
 i. Inconsistency with the choice-of-law provision ........... 894
 ii. Inconsistency with express limitations .................. 894
 d. Inconsistent interpretation by the administrator .............. 896
 e. Inconsistency with clear language of the Plan ................ 896
 3. Summary .......................................................... 897
 C. Application Of The "Substantial Evidence" Test ...................... 897
 1. Wickman's evaluation of the facts ................................. 897
 2. Intoxicated driver cases applying Wickman ........................ 898
 3. Misapplications of Wickman ....................................... 901
 4. Aetna's evaluation of the facts .................................... 902
 D. Prejudgment Interest And Attorney's Fees ........................... 904

III. CONCLUSION .............................................................. 905

Was an intoxicated driver's death when the car he was driving missed a curve on a highway as he returned home from an office Christmas party an "accident" within the meaning of an accidental death insurance policy governed by ERISA? The insurer denied coverage under the policy, concluding that the driver's death was not an "accident" within the meaning of the policy, as interpreted by the insurer as plan fiduciary, because his death was not "unexpected, unusual, and unforeseen." The driver's widow contends that the insurer's conflict of interest and procedural irregularities in denial of her claim were so egregious that the insurer's determination to deny benefits is entitled to no deference whatsoever, even if the insurer had the discretion under the ERISA plan to define "accident." In the alternative, however, she contends that the insurer's determination to deny benefits on the basis of its definition of "accident," because her husband was intoxicated at the time of his fatal crash, fails even the most deferential "arbitrary and capricious" review.

## I. INTRODUCTION

### A. Findings Of Fact

The factual background to this case is essentially undisputed. Nevertheless, to place the legal analysis to follow in proper context, the court must detail its findings regarding the circumstances of the plaintiff's decedent's death and the defendant's denial of the plaintiff's claim for accidental death benefits.

### 1. The crash

Plaintiff's decedent, Delane O. West, was 59 years old when he was killed at approximately 11:00 p.m. on the night of December 13, 1997. West, a night manager for United Parcel Service (UPS), had attended a UPS Christmas party that night. He was apparently returning to his home in Denison, Iowa, when his car missed a curve on U.S. Highway 59, three miles south of Denison, struck a tree, and flipped over on the driver's side. West was not wearing a seatbelt. Dr. D.W. Crabb, M.D., the Crawford County Medical Examiner, declared West dead at the scene. See, e.g., Exhibit 2, Investigating Officer[']s Report, Joint Appendix at 38–39. Road conditions were clear and dry and neither party contends that they contributed to the cause of the crash. The parties do not dispute that West was intoxicated at the time of the crash.

### 2. Post-mortem analysis

At the request of Dr. Crabb, Dr. Michael T. Kafka, a State Medical Examiner, performed an autopsy on Mr. West on December 14, 1997. Exhibit 4, Report of Autopsy, Joint Appendix at 41–46. Toxicology tests showed that West's blood alcohol content ("BAC") was 203 mg/dL, or .203, more than twice the legal limit of .10 under Iowa law. See id., Final Patient Report (Pathology), at 1, Joint Appendix at 46; see also IOWA CODE § 321J.2(1)(b) ("A person commits the offense of operating while intoxicated if the person operates a motor vehicle in this state ... [w]hile having an alcohol concentration as defined in section 321J.1 of .10 or more."); IOWA CODE § 321J.1(1)(a) ("As used in this chapter unless the context otherwise requires ... '[a]lcohol concentration' means the number of grams of alcohol per ... [o]ne hundred milliliters of blood."). Dr. Kafka identified the "PROBABLE CAUSE OF DEATH" as "Multiple traumatic injuries sustained during motor vehicle accident," and "OTHER SIGNIFICANT CONDITIONS" as "Ethanol intoxication." Id. at 1, Joint Appendix at 41. Similarly, Dr. Kafka's "SUMMARY" of the results of the autopsy consisted of the following:

The death of this 59–year–old male is due to multiple severe traumatic injuries

resulting from a single motor vehicle accident. Ethanol intoxication was a significant contributing factor.

*Id.*

On December 17, 1997, Dr. Crabb certified a Certificate of Death for West, indicating that the "immediate cause" of West's death was "(a) *Massive Head Trauma* due to (or as a consequence of) (b) *Motor Vehicle Crash* due to (or as a consequence of) (c) *Acute Alcoholic Intoxication.*" Exhibit 3, Certificate of Death, Joint Appendix at 40 (underlining showing entries by certifier). The Certificate of Death indicates further that the "approximate interval between onset and death" for the head trauma and motor vehicle crash was "immediate" and for the alcoholic intoxication was "2–4 hrs." *Id.* The Certificate of Death states further that the "Toxicology from Autopsy [indicated] Alcohol 274 vitreous, 203 blood, 199 urine." *Id.* Dr. Crabb certified the "Manner of Death" on the death certificate as "Accident." *Id.*

### 3. The benefit plan

West's widow, plaintiff Theresa West, made a claim for death benefits under a group benefit plan provided by defendant Aetna Life Insurance Company through West's employer, UPS. *See* Exhibit 1, UPS Plan, Joint Appendix. The UPS Plan provides life insurance, accidental death and dismemberment coverage, and disability coverage. In pertinent part, the Accidental Death and Dismemberment Coverage portion of the UPS Plan states, "This Plan pays a benefit if, while insured, you suffer a bodily injury in an accident and if, within 90 days after the accident, you lose, as a direct result of the injury ... [y]our life." *Id.* at 5, Joint Appendix at 10. The beneficiary's "full Principal Sum is payable for loss of life." *Id.* However, this portion of the UPS Plan contains the following "Limitations":

Benefits are paid for losses caused by accidents only. No benefits are payable for a loss caused or contributed to by:

- Bodily or mental infirmity.
- Disease, ptomaines or bacterial infections.*
- Medical or surgical treatment.*
- Suicide or attempted suicide.
- Intentionally self-inflicted injury.
- War or any act of war (declared or undeclared).
 - * These do not apply if the loss is caused by:
 - An infection which results directly from the injury.
 - Surgery needed because of the injury.

*Id.* The accidental death benefits portion of the UPS Plan thus does not contain an express limitation excluding benefits for a loss caused or contributed to by intoxication.

### 4. Denial of West's claim

Aetna paid Mrs. West's claim for basic life insurance benefits under the UPS Plan, but, by letter dated June 15, 1998, denied payment of her claim for benefits under the Group Accidental Death and Dismemberment Coverage portion of the UPS Plan. *See* Exhibit 5, June 15, 1998, Letter from Gail H. Drake, Investigator, Aetna Life Insurance Company (June 15, 1998, Denial Letter), Joint Appendix at 47–49. In pertinent part, the June 15, 1998, Denial Letter states the following:

We are in receipt of the additional information needed to review your claim for the accidental death benefits. Thank you for your patience during this difficult time.

We have completed our review of the information submitted on the claim for the Accidental Life Insurance benefit.

We regret to inform you we must deny payment of the accidental death benefit in the amount of $14,000 Basic and $53,000 Flex.

Information on the death certificate indicated Mr West [sic passim] died on December 13, 1997 as the result of "massive head trauma due to motor vehicle creash [sic] due to acute alcoholic intoxication". The injuries were sustained when Mr West drove his car off the road on Highway 59 and struck a tree and flipped over about 11:00 P.M. on the 23rd [sic]. This information in [sic] from the Iowa Department of Transportation Investigation [sic] Officers [sic] Report. This report also indicates no protective devices were is [sic] use. Through a telephone call to the Crawford County Sheriff we were able to verify that the road condition was dry and the weather was clear.

We also secured a copy of the autopsy report. According to the Iowa State Medical Examiner, the autopsy was performed on December 14, 1997. This report indicates Mr. West had a blood alcohol level of 203 mg/dL. The autopsy summary states "The death of this 59–year old male is due to multiple severe traumatic injuries resulting from a single motor vehicle accident. Ethanol intoxication was a significant contributing factor."

Mr. West intentionally consumed alcohol which resulted in his blood ethonal [sic] level to exceed [sic] the Iowa State legal limit of 10mg/dL [sic]. According to "Forensic Pathology" written by Dominick and Vincent DiMaio (1989), the signs and symptoms of an individual with Acute Alcohol Intoxication with a blood alcohol level of 20–30mg/dL [sic] are as follows: "Staggering, grossly impaired in motor activities, reaction times, attention, visual acuity and judgment; drunk. Progressive increase in disorientation, emotional lability. Loss of cordination [sic], slurred speech. May be lethargic and sleepy or hostile and aggressive". *Mr. West's intentional act exposed himself to unnecessary risks which were reasonably foreseeable and such that he should have known or appreciated the consequences of his intentional acts, including the liklihood [sic] or strong possibility of death. The serious risks associated with driving while intoxicated are widely publicized.*

*Our review of this Accidental Death claim has determined that Mr. West's death, in this instance, was not the result of an accident as required by the plan of insurance. An accident is an event which happens by chance, or fortuitously, without intention or design, and which is unexpected, unusual and unforeseen. In theis [sic] situation, the insured should have foreseen the consequences of drinking and operating a motor vehicle while intoxicated. Although we do not know his true level of impairment prior to the incident, based on the above published documentation, there eould [sic] have been some degree of impairment with a blood alcohol level of 203mg/dL.*

*Accidental Death Insurance benefits are payable if an insured dies from an accident and the death is within 90 days of the accident. This benefit is not payable for a death caused by: bodily or mental infirmity, disease, ptomaines or bacterial infections, medical or surgical treatment, suicide or intentionally self-inflicted injury, war or any act of war and your committing an unlawful act of agression [sic], including a misdemeaner [sic] or felony.*

*Therefore, we must deny the claim for the Accidental Death benefit and no additional benefits will be payable as this loss does not meet the definitio [sic] of an accident. We regret our decision could not have been more favorable.*

June 15, 1998, Denial Letter at 1–2, Joint Appendix at 47–48 (emphasis added). The remainder of the June 15, 1998, Denial Letter informs Mrs. West of her rights to further review of the investigator's benefits determination and a reservation of Aetna's rights and defenses. *Id.* at 2–3, Joint Appendix at 48–49.

On October 5, 1998, Aetna's investigator wrote another letter, this time to Mrs. West's attorney. *See* Exhibit 6, October 5, 1998, Letter from Gail H. Drake, Investigator, Aetna Life Insurance Company (October 5, 1998, Reaffirmation of Denial Letter), Joint Appendix at 50–51.[1] This letter was apparently in response to a letter from Mrs. West's attorney dated September 18, 1998, which is not in the record, but which apparently indicated that Mrs. West did not agree with Aetna's decision to deny the accidental death benefit in response to her request for payment of her claim. *See id.* at 1, Joint Appendix at 50 (first paragraph). In the letter of October 5, 1998, Aetna reaffirmed its denial of Mrs. West's claim for accidental death benefits under the UPS Plan, as follows:

> In my letter of June 15, I advised the cause of death on the death certificate was indicated as "massive head trauma due to motor vehicle crash due to acute alcoholic intoxication". The manner of death was indicated as "accident". Based on this information we secured a copy of the Iowa State Medical Examiner's report for details of the injuries and toxocology [sic] results. We also secured a copy of the Iowa Department of Transportation Investigation [sic] Officers [sic] Report and also spoke with the Sheriff's office for information on driving and road conditions.
>
> Based on the Iowa State Medical Examiner's toxicology results, Mr West's [sic passim] blood alcohol level was stated as 203 mg/dL. The report also stated that "ethanol intoxication was a significant contributing factor." Based on the Sheriff's office investigation, it did not appear that the road, vehicle or weather conditions were a contributing factor to cause a motor vehicle accident.
>
> My letter also stated we did not know Mr West's true level of impaiment [sic] due to his intoxication. However, according to our source, "Forensic Pathology", the signs and symptoms of a person with Acute Alcohol Intoxication with a blood alcohol level of 20–30 mg/dL [sic] are staggering, gross impaired motor activities and reaction time, loss of coordination and slurred speech.
>
> The Accidental Death Insurance benefit is payable if an insured dies from an accident. Enclosed is a copy of the Accidental Death provision from United Parcel. *I stated in my previous letter that the loss does not meet the definition of an accident.* No where [sic] in my letter did I state Mr West commited [sic] suicide nor did I imply he commited [sic] suicide. *Our denial of the claim for the accidental death benefit was not based on any of the limitations indicated in this provision.* However, the limitations were listed in the letter for your reference.
>
> *An accident is an event which happens by chance, or fortuitously, without intention or design, and which is unexpected, unusual and unforeseen. In this situation, Mr. West intentionally consumed alcohol. He should have rea-*

---

1. The court notes that the first page of this letter is dated October 5, 1998, but the second page is dated September 5, 1998. The court does not find that the date is in any way determinative of issues involved in this case and constitutes merely a typographical error. The court points it out merely to be clear about the identification and pagination of the pertinent document.

*sonably foreseen the consequences of drinking and operating a motor vehicle while intoxicated. The serious risks associated with driving while intoxicated are widely publicized.*

*We maintain the denial of the Accidental Death benefit as the incident does not qualify as an accident. Therefore, no Accidental Death benefits are payable.*

We would like to reference here case law which addresses the issue of denial of benefits on the grounds that decedent's death in a traffic accident while operating a vehicle under the influence was not an accident. Please refer to: Miller v Auto–Alliance International, Inc. (1997, United States District Court E.D. Michigan), Fowler v Metropolitan Life Insurance (1996, United States District Court W.D. Tennessee) and Cozzie v Metropolitan Life Insurance (1997, United States District Court N.D. Illinois).

We regret our decision could not have been more favorable. As always, we are willing to review any additional information submitted.

October 5, 1998, Reaffirmation of Denial Letter at 1–2, Joint Appendix at 50–51.

### B. Procedural Background

On December 2, 1998, plaintiff Theresa West filed this lawsuit against defendant Aetna Life Insurance Company in the Iowa District Court for Crawford County alleging wrongful denial of insurance benefits under the accidental death portion of the UPS Plan following her husband's death in the automobile crash on December 13, 1997. Aetna answered the original petition on February 1, 1999. On December 3, 1999, Mrs. West filed a motion for leave to amend her petition to assert, as Count II, a claim of failure to pay benefits in violation of the Employee Retirement Income Security Act of 1974 (ERISA), as amended, 29 U.S.C. § 1001 *et seq.* On the basis of this federal claim, Aetna removed this action to this federal court on December 22, 1999, and answered the amended petition in this court on December 23, 1999.

On December 27, 1999, a magistrate judge of this court granted Theresa West's motion for leave to amend her complaint, directing her to file an amended and substituted complaint by January 17, 2000. Mrs. West complied by serving an Amended and Substituted Complaint on January 14, 2000, which was filed on January 18, 2000. In her Amended and Substituted Complaint, Mrs. West asserts a single claim of breach of fiduciary duty in violation of ERISA in denial of death benefits under the accidental death portion of the UPS Plan. Specifically, Mrs. West alleges the following:

10. Defendant breached its fiduciary duty in denying death benefits to the Plaintiff in the following particulars:

(A) In failing to conduct an adequate, thorough investigation prior to determining that the cause of death was not accidental;

(B) In determining the cause of death was not accidental without a factual basis to support the conclusion;

(C) In claiming that intoxication is a justification to refuse to pay accidental death benefits without a basis to support that denial for that sole reason under the terms of the plan document;

(D) In favoring its own interests to deny payment over plan interests to provide compensation for accidental death.

Amended and Substituted Complaint, ¶ 10. Mrs. West seeks an order compelling Aetna to pay all death benefits due under the UPS Plan, pre-judgment interest from the

date the death benefits should have been paid until the date of judgment, attorney's fees and costs, and such other relief as the court deems just and proper. *Id.* at Prayer. Aetna answered the Amended and Substituted Complaint on January 27, 2000.

On May 23, 2001, the parties jointly requested adjudication of this matter on written submissions. Pursuant to a scheduling order, as amended, the parties filed a Joint Appendix on July 20, 2001; Mrs. West filed her trial brief on July 30, 2001; Aetna filed a responsive trial brief on August 27, 2001; and Mrs. West filed her reply brief on September 7, 2001. The court heard oral arguments on the merits of the case on September 14, 2001. At the oral arguments, plaintiff Theresa West was represented by Michael R. Mundt of Mundt, Franck & Schumacher in Denison, Iowa. Defendant Aetna Life Insurance Company was represented by Sarah J. Kuehl of Heidman, Redmond, Fredregill, Patterson, Plaza, Dykstra & Prahl in Sioux City, Iowa. The oral arguments were highly informative and spirited. This matter is now fully submitted for determination on the merits.

## II. LEGAL ANALYSIS (Including Further Necessary Findings Of Fact)

### A. Review Of Benefits Determinations Under ERISA

The Eighth Circuit Court of Appeals recently summarized the standard ordinarily applicable to a court's review of a fiduciary's benefits determination under ERISA as follows:

"ERISA provides a plan beneficiary with the right to judicial review of a benefits determination." *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1160 (8th Cir. 1998); *see* 29 U.S.C. § 1132(a). It is undisputed that the Toro Plan gives the administrator discretionary authority to determine eligibility for benefits, so we would ordinarily review the administrator's decision for abuse of discretion. *See Woo,* 144 F.3d at 1160. "This deferential standard reflects our general hesitancy to interfere with the administration of a benefits plan." *Layes v. Mead Corp.,* 132 F.3d 1246, 1250 (8th Cir. 1998). Under such standard, a reviewing court should consider only the evidence before the plan administrator when the claim was denied. *Id.* at 1251.

*Heaser v. Toro Co.,* 247 F.3d 826, 833 (8th Cir.2001).

The parties here agree that, as in *Heaser,* the UPS Plan gives Aetna discretionary authority to determine eligibility for benefits, so that the court would ordinarily review Aetna's decision to deny accidental death benefits in this case for abuse of discretion. *Id.* Indeed, the UPS Plan unequivocally states both Aetna's discretionary authority and the "abuse of discretion" standard of review:

For the purpose of section 503 of Title 1 of the Employee Retirement Income Security Act of 1974, as amended (ERISA), Aetna is a fiduciary with complete authority to review all denied claims for benefits under this policy. This includes, but is not limited to, the denial of certification of the medical necessity of hospital or medical treatment. In exercising such fiduciary responsibility, Aetna shall have discretionary authority to:

determine whether and to what extent employees and beneficiaries are entitled to benefits; and

construe any disputed or doubtful terms of this policy.

Aetna shall be deemed to have properly exercised such authority unless Aetna abuses its discretion by acting arbitrarily and capriciously.

UPS Plan at 9190, Joint Appendix at 37. The court therefore begins its legal analy-

sis with consideration of the deferential "abuse of discretion" standard of review "ordinarily" applicable to a plan administrator's discretionary denial of benefits. *See Heaser,* 247 F.3d at 833.

### 1. Deferential review

Under the deferential "abuse of discretion" standard of review, "an administrator's decision to deny benefits will stand if reasonable." *Farley v. Arkansas Blue Cross & Blue Shield,* 147 F.3d 774, 777 (8th Cir.1998).[2] However, as the Eighth Circuit Court of Appeals has also explained, the nature of the review for "reasonableness" depends upon the basis on which the plan administrator denied the claim for benefits. *See Donaho v. FMC Corp.,* 74 F.3d 894, 898–900 (8th Cir.1996); *see also Farley,* 147 F.3d at 777 & n. 6 (citing *Donaho* ).

### a. Review of plan interpretation

■ "When determining whether an administrator's interpretation of a plan is reasonable, [courts in this circuit] apply a five-factor test." *Farley,* 147 F.3d at 777 n. 6 (citing *Finley v. Special Agents Mut. Benefit Ass'n, Inc.,* 957 F.2d 617, 621 (8th Cir.1992)); *Donaho,* 74 F.3d at 899 n. 9 (same, also citing *Finley* ). That five-factor test, as explained in *Finley v. Special Agents Mutual Benefit Association, Inc.,* 957 F.2d 617 (8th Cir.1992), consists of the following:

> In determining whether the [plan administrator's] interpretation of [disputed terms] and decision to deny the [claimed] benefits are reasonable, [courts] consider [1] whether [the plan administrator's] interpretation is consistent with the goals of the Plan, [2] whether [the plan administrator's] interpretation renders any language in the

Plan meaningless or internally inconsistent, [3] whether [the plan administrator's] interpretation conflicts with the substantive or procedural requirements of the ERISA statute, [4] whether [the plan administrator] ha[s] interpreted the words at issue consistently, and [5] whether [the plan administrator's] interpretation is contrary to the clear language of the Plan. *See de Nobel v. Vitro Corp.,* 885 F.2d 1180, 1188 (4th Cir.1989) (citing cases).

*Finley,* 957 F.2d at 621.

### b. Review of factual determinations

■ However, when the court is "asked to review the administrator's evaluation of the facts to determine the application of the Plan … the five-factor test is not instructive." *Farley,* 147 F.3d at 777 n. 6 (citing *Donaho,* 74 F.3d at 899–900 n. 9). Instead, in such circumstances, "[i]n determining reasonableness, [courts of this circuit] focus on whether the decision is supported by substantial evidence." *Id.* at 777 (citing *Donaho,* 74 F.3d at 900); *Donaho,* 74 F.3d at 900 (concluding that " 'substantial evidence' is only a quantified reformulation of reasonableness" in cases involving the plan administrator's evaluation of the facts to determine plan application). "Substantial evidence" is " 'more than a scintilla but less than a preponderance.' " *Woo,* 144 F.3d at 1162 (quoting *Donaho,* 74 F.3d at 900 n. 10).

■ As to the process to determine whether the administrator's determination is supported by "substantial evidence," "[courts] consider only the evidence that was before the administrator when the claim was denied." *Farley,* 147 F.3d at 777 (citing *Brown v. Seitz Foods, Inc.,*

---

**2.** The Eighth Circuit Court of Appeals has explained that "abuse of discretion," "arbitrary and capricious," and "reasonableness" are synonymous in the context of review of

denial of claims under ERISA. *See Donaho v. FMC Corp.,* 74 F.3d 894, 898–900 (8th Cir. 1996).

*Disability Benefit Plan,* 140 F.3d 1198, 1200 (8th Cir.1998)). However, courts do not "substitute [their] own weighing of the evidence for that of the administrator." *Id.* (citing *Cash v. Wal–Mart Group Health Plan,* 107 F.3d 637, 641 (8th Cir. 1997)). Despite this deference to the plan administrator's weighing of the evidence, "[t]he unreasonableness of a plan administrator's decision can be determined by both the quantity and quality of the evidence supporting it." *Donaho,* 74 F.3d at 900.

### c. The deferential review applicable here

The parties agree that, if only deferential review is appropriate here, the determination by Aetna in question involves interpretation of the UPS Plan, and specifically, the interpretation of "accident," so that the applicable "reasonableness" review is the five-factor test outlined in *Finley v. Special Agents Mutual Benefit Association, Inc.,* 957 F.2d 617, 621 (8th Cir.1992). The court agrees, to the extent that Aetna's interpretation of "accident" within the meaning of the UPS Plan was in fact outcome determinative of the denial of Mrs. West's claim for accidental death benefits.

However, the court has taken some pains to distinguish review of an administrator's interpretation of plan terms from review of an administrator's evaluation of the facts to determine the application of the plan, because the court finds that the parties' arguments do not reflect a clear application of that distinction in this case. Thus, the court must determine whether the parties have addressed the "reasonableness" of Aetna's benefits determination in this case in terms of "plan interpretation," "evaluation of the facts," or both.

### i. "Interpretation" or "evaluation of the facts" in the parties' arguments. In the portion of her brief asserting that Aet-

na's decision to deny accidental death benefits was arbitrary and capricious, Mrs. West argues primarily that Aetna's decision is "unreasonable" in light of the five-factor test in *Finley. See* Plaintiff's Trial Brief, § IV, beginning on page 9. However, she states the standard of review as follows:

> [T]he Plan Administrator's decision to deny benefits will stand if reasonable and supported by substantial evidence. See *Farley,* 147 F.3d at 776. The five (5) factors to determine whether the decision is reasonable are discussed in *Cash,* 107 F.3d 637 at 641 . . . .

Plaintiff's Trial Brief at 10. This statement clearly mixes the two distinct kinds of "reasonableness" review, which, as explained in *Donaho* and *Farley,* and by this court above, are applicable to different bases for the administrator's decision to deny benefits, "substantial evidence" review for the administrator's evaluation of the facts and the *Finley* five-factor test for review of the administrator's plan interpretation. Mrs. West also plainly contests the administrator's evaluation of the facts when she asserts that, "[u]nless a Court [and presumably a plan administrator] can provide objective facts to support its conclusion that a person who drives while intoxicated knows serious injury or death will result, the court is simply reading into the term 'accident' a moralistic judgment," and then argues that there are not sufficient facts identified by Aetna to demonstrate that a person driving while intoxicated is "highly likely" to die. *See* Plaintiff's Trial Brief at 28–31. Moreover, in her Amended and Substituted Complaint, Mrs. West's first two specifications of Aetna's breach of fiduciary duty appear to be aimed at Aetna's factual determinations leading to its denial of benefits in this case. Specifically, Mrs. West's apparent challenges to factual determinations by Aetna consist of the following:

10. Defendant breached its fiduciary duty in denying death benefits to the Plaintiff in the following particulars:

 (A) In failing to conduct an adequate, thorough investigation prior to determining that the cause of death was not accidental;

 (B) In determining the cause of death was not accidental without a factual basis to support the conclusion.

Amended and Substituted Complaint, ¶ 10. Thus, even though Mrs. West has couched her arguments primarily in terms of a challenge to Aetna's interpretation of plan terms under the *Finley* five-factor test, she actually contests Aetna's decision to deny benefits on the basis of both interpretation of "accident" and Aetna's evaluation of the facts in the case leading to Aetna's conclusion that the "accidental death" coverage under the UPS Plan is inapplicable.

Aetna also argues the "reasonableness" of its evaluation of the facts to determine application of the plan. Aetna expressly argues, on the basis of citations to the "substantial evidence" standard in *Farley*, 147 F.3d at 776, that its decision to deny benefits in this case was "supported by the facts which undisputedly show that decedent was acutely intoxicated at the time he drove his car off the road and into a tree" and by "other evidence" suggesting that Mr. West's intoxication was the cause of the fatal crash. Defendant's Trial Brief at 8–9. Aetna also argues, on the basis of the evidence of Mr. West's intoxication, that the consequences of a fatal crash were reasonably foreseeable, *see id.* at 10, including an argument that the autopsy report is sufficient to establish intoxication as a cause of the crash. *See id.* at 12–13. Aetna also argues that the autopsy report's identification of the cause of death as "accident" is not determinative here of the applicability of the UPS Plan. *See id.*

On the other hand, Aetna argues the merits of its interpretation of "accident" within the meaning of the UPS plan under the *Finley* factors. *See id.* at 14–16.

Thus, the court finds that, although somewhat blurred in their submissions, the parties contest the "reasonableness" of Aetna's decision both in terms of plan interpretation and evaluation of the facts to decide whether the plan, as interpreted, is applicable.

***ii. Blurring in the case law.*** It is not surprising that there is some blurring of the applicable standards in the parties' submissions, because the distinction in *Farley* between review of plan interpretation and review of evaluation of facts to determine application of the plan as interpreted has not always been articulated so distinctly. Consideration of three decisions of the Eighth Circuit Court of Appeals will demonstrate the point.

The Eighth Circuit Court of Appeals attempted to distinguish between the "reasonableness" review for plan interpretation and the "reasonableness" review for evaluation of facts in *Donaho v. FMC Corp.*, 74 F.3d 894 (8th Cir.1996). In *Donaho*, the court explained the "reasonableness" determination for evaluation of facts as follows:

> [A] trustee decision is reasonable if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision. *Put another way, the committee's decision need not be the only sensible interpretation,* "so long as its decision 'offer[s] a reasoned explanation, based on the evidence, for a particular outcome.'" *Krawczyk v. Harnischfeger Corp.*, 41 F.3d 276, 279 (7th Cir.1994) (citations omitted).

*Donaho*, 74 F.3d at 899 (emphasis of "could" and "would" in the original; other

emphasis added). Immediately after the text quoted in block above, the court in *Donaho* pointed out that the *Finley* factors are not applicable to this sort of factual evaluation. *See id.,* 74 F.3d at 899–900 n. 9. Thus, this quotation and the reference to the *Finley* factors in the *Donaho* decision distinguished between reasonableness of "interpretation" of *applicability* of the plan, "based on the evidence," *i.e.,* as a matter of evaluation of the facts to determine the applicability of the plan, and "interpretation of the plan," the reasonableness of which is measured by the *Finley* factors.

However, in *Cash v. Wal–Mart Group Health Plan,* 107 F.3d 637 (8th Cir.1997), although the court relied on *Donaho* for the applicable standard of review, the distinction between the standards of review applicable to interpretation of plan terms and factual determinations is not as plain as it was in *Donaho.* First, in *Cash,* the court explained,

> The [plan administrator's] decision will be deemed reasonable if "a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." [*Donaho,* 74 F.3d at 899]. If the decision is supported by a reasonable explanation, it should not be disturbed, even though a different reasonable interpretation could have been made. *See id.*

*Cash,* 107 F.3d at 641 (emphasis in the original). Thus, in the first instance, the court in *Cash* described "reasonableness" review in terms of "reasonableness" of the *decision* in light of the *evidence* before the plan administrator. The "reasonable interpretation" referred to in the second sentence from *Cash* quoted above, in context, must therefore refer to reasonable interpretation of the *evidence.* Indeed, this would be consistent with the *Donaho* decision, upon which the court in *Cash* relied, in that the court in *Donaho* stated

that "the committee's *decision* need not be the only sensible *interpretation,* 'so long as its decision offer[s] a reasoned explanation, *based on the evidence,* for a particular outcome.'" *Donaho,* 74 F.3d at 899 (quoting *Krawczyk,* 41 F.3d at 279, with citations omitted) (emphasis added here), a matter the court in *Donaho* described as "evaluat[ion of] facts to determine the plan's application." *See id.* at 899–900 n. 9. Although the court in *Cash* began with a standard of review for evaluation of the facts, consistent with *Donaho,* it then identified and applied the *Finley* factors in reference to the plan administrator's interpretation of "preexisting condition." *See Cash,* 107 F.3d at 641–44. While this was consistent with *Donaho,* what is confusing is that, immediately following the identification of the *Finley* factors—which the *Donaho* decision had stated were not applicable to a factual determination—the court in *Cash* inserted a statement that, "[i]n making its evaluation, the court does not substitute its own weighing of the evidence for that of the Committee," which is a standard articulated in *Donaho* in reference to *factual* determinations. *See Cash,* 107 F.3d at 641.

The distinction between "reasonableness" review of "plan interpretation" and "evaluation of the facts" becomes even less clear in *Solger v. Wal–Mart Stores, Inc.,* 144 F.3d 567 (8th Cir.1998), a decision that relies on *Cash.* In *Solger,* the court apparently read the reference to "interpretation" in *Cash* as meaning plan interpretation, and/or used "interpretation" as synonymous with "decision":

> Applying this deferential standard of review, we will reverse the plan administrator's interpretation of the plan only if it is unreasonable. We will sustain the administrator's *interpretation* if it is reasonable, even if it is not the only reasonable *interpretation of the plan,* and even if we would have chosen a

different *interpretation* had the initial decision been ours to make. *See [Cash,* 107 F.3d at 641.]

*Solger,* 144 F.3d at 568 (emphasis added); *and compare Cash,* 107 F.3d at 641 (as quoted above). Although the court in *Solger* attempted to state the standard of review for reasonableness of a plan administrator's "interpretation of the plan," in reliance on *Cash,* the court made no reference whatsoever to the *Finley* factors the court in *Cash* actually applied to the interpretation of the plan term "preexisting condition." Indeed, the court in *Solger* decided the case entirely on the basis of the reasonableness of factual findings that a benefits cap for TMJ treatments and conditions applied to particular treatments and that a condition requiring treatment had been caused by both the claimant's TMJ and her TMJ implants, and thus treatment for that condition was subject to the TMJ benefits cap. *See Solger,* 144 F.3d at 569.

While the courts in *Cash* and *Solger* had the *Donaho* decision available to them, they did not have the benefit of the subsequent decision in *Farley v. Arkansas Blue Cross and Blue Shield,* 147 F.3d 774 (8th Cir.1998), which even more clearly distinguishes between the "reasonableness" determination for plan interpretation, on the one hand, and the "reasonableness" determination for factual evaluation, on the other. In *Farley,* as explained above, the court expressly related the *Finley* five-factor test to "plan interpretation" and explained that, when "[w]e are asked to review the administrator's evaluation of the facts to determine the application of the Plan ... the five-factor test is not instructive." *Farley,* 147 F.3d at 777 n. 6 (citing *Donaho,* 74 F.3d at 899–900 n. 9). Instead, *Farley* holds, in determining the "reasonableness" of the administrator's evaluation of the facts, courts of this circuit must "focus on whether the decision is

supported by substantial evidence." *Id.* at 777 (citing *Donaho,* 74 F.3d at 900).

Because the "reasonableness" of Aetna's decision to deny benefits in this case is contested on the basis of both the "reasonableness" of Aetna's interpretation of the plan, as regards the meaning of "accident," and the "reasonableness" of Aetna's evaluation of the facts to determine whether the UPS Plan is applicable, in light of Aetna's interpretation of "accident," the court must conduct both a five-factor *Finley* test of Aetna's interpretation of the key plan term and a "substantial evidence" analysis of Aetna's factual finding that Mr. West's death does not fit the definition of "accident," as Aetna has interpreted that plan term. However, before performing this "ordinary" deferential review, *see Heaser,* 247 F.3d at 833, the court must also take up Mrs. West's contention that "less deferential" review is appropriate in this case.

## 2. *"Less deferential" review*

### a. When *"less deferential" review is appropriate*

■ Although courts must "ordinarily review the administrator's decision for abuse of discretion," *see Heaser,* 247 F.3d at 833, as the Eighth Circuit Court of Appeals also explained in *Heaser,* an administrator's denial of benefits is not *always* entitled to that sort of "deferential" review:

A plaintiff may obtain less deferential review by presenting "material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her." *Woo,* 144 F.3d at 1160. An alleged conflict or procedural irregularity must have some connection to the substantive decision reached. *Id.* at 1161. A claimant must offer evidence that "gives rise

to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim" for us to apply the less deferential standard. *Layes,* 132 F.3d at 1250 (internal quotation marks omitted). *Heaser,* 247 F.3d at 833. Thus, when faced with a contention that less deferential review is appropriate, the court must decide whether the claimant has "offer[ed] evidence that 'gives rise to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim.'" *Id.* (quoting *Layes,* 132 F.3d at 1250). There are two steps in that process: The court must first decide whether the claimant has presented "material, probative evidence demonstrating that ... a palpable conflict of interest or a serious procedural irregularity existed," then determine whether that conflict or irregularity " 'caused a serious breach of the plan administrator's fiduciary duty to her.'" *Id.* (quoting *Woo,* 144 F.3d at 1160).

If the claimant has persuaded the court that there is a conflict of interest or procedural irregularity that caused a breach of the administrator's fiduciary duty, such that "less deferential" review is appropriate, the court must decide what "proportion" of deference should be given the plan administrator's determination in light of the conflict of interest or procedural irregularities. *See Woo,* 144 F.3d at 1161–62. For example, in *Woo,* after finding a conflict and irregularities that "had a sufficient connection to the decision reached to trigger a less deferential review," the court decided that the conflict and irregularities were so "egregious" that the court would "require that the record contain substantial evidence bordering on a preponderance to uphold [the administrator's] deci-

sion" to deny benefits on factual grounds. *Id.* at 1162.

### b. Plaintiff's grounds for "less deferential" review

***i. Conflict of interest.*** Mrs. West argues that "less deferential" review is appropriate here, because Aetna had a conflict of interest as both insurer and plan administrator for the UPS Plan. She argues that, as a profit-making company, Aetna had a financial interest in denying her claim, to the extent of the benefits it would have to pay. She relies on *Armstrong v. Aetna Life Insurance Company,* 128 F.3d 1263 (8th Cir.1997), in which the court found that a conflict of interest required heightened scrutiny—indeed, *de novo* review—of the administrator's denial of benefits on this ground. Mrs. West argues that her case is an example of why an insurer responsible for paying claims out of its own assets should never be a plan administrator. Although Aetna did not cite the *Armstrong* decision in its written submissions—despite the fact that the case is clearly on point and clearly involved a related defendant [3]—Aetna argues that an insurer does not necessarily have a conflict of interest, simply because it is the plan administrator and the financially responsible entity, citing *Lawyer v. Hartford Life and Accident Insurance Company,* 100 F.Supp.2d 1001, 1009 (W.D.Mo.2000), and *Davolt v. Executive Committee of O'Reilly Automotive,* 206 F.3d 806, 809 (8th Cir.2000). Aetna contends that other authority, including the decision in *Lawyer,* suggests that any "conflict of interest" arising from its financial interest in whether or not a particular claim was paid was negated in the circumstances presented here by its long-term

---

**3.** Aetna's counsel represented to the court that Aetna's failure to cite the *Armstrong* decision was merely an oversight, not any attempt to "hide" pertinent authority from the court, and the court accepts that representation.

business interests, which would be hurt by unwarranted denial of claims.

In *Armstrong*, the Eighth Circuit Court of Appeals concluded that the Aetna entity that was the plan administrator in that case "faces a continuing conflict in playing the dual role of administrator and insurer of health benefit plans" because "[a]s the insurer, Aetna has an obvious interest in minimizing its claim payments," Aetna had "claims savings" incentives for its claims reviewers, and this arrangement was not "the type ERISA provides as administered 'solely in the interest of the participants and beneficiaries.'" *Armstrong*, 128 F.3d at 1265 (quoting 29 U.S.C. § 1104(a)(1)). Similarly, here, the Aetna entity that administered the UPS Plan also has "an obvious interest in minimizing its claim payments," where it is also the insurer, which means that it "faces a continuing conflict in playing the dual role of administrator and insurer of the [accidental death benefits] plan." *Cf. id.* This is not a case in which the administrator/insurer is a not-for-profit organization, such that it would not necessarily be conflicted by a profit motive in its benefits determinations. *See Farley*, 147 F.3d at 777 & n. 5. Although Mrs. West urges the court to find that the same kind of "claims savings" incentives were at work here as in *Armstrong*, in the absence of any evidence that such incentives had been discontinued in the relatively brief interval between the *Armstrong* decision and the denial of her claim for accidental death benefits, the court will not do so, because, as Aetna rightly points out, there is no showing that the same claims investigation personnel were involved in the denial of health benefits in *Armstrong* and the denial of accidental death benefits in this case, or that similar "claims saving" incentives were ever used in the processing of accidental death benefits claims.

In a more recent decision, *Davolt v. Executive Committee of O'Reilly Automotive*, 206 F.3d 806 (8th Cir.2000), the Eighth Circuit Court of Appeals concluded that *Armstrong* "did not ... create a blanket rule mandating de novo review in all cases where the insurer of a health benefits plan is also the plan administrator." *Davolt*, 206 F.3d at 809. Rather, the court in *Davolt* read *Armstrong* to hold "that the inquiry is fact specific and limited to instances where the relationship places the ERISA benefits plan administrator in a 'perpetual' conflict of interest." *Id.* (citing *Armstrong*, 128 F.3d at 1265). Thus, "[a]lthough the fact that the plan administrator is also the insurer may give rise to a conflict of interest, the district court [in *Davolt*] erred when it assumed an automatic conflict of interest existed." *Id.; see also Barnhart v. UNUM Life Ins. Co. of Am.*, 179 F.3d 583, 587 (8th Cir.1999) (where an insurer/plan administrator "will have a direct financial benefit when it denies a claim[, s]uch a conflict of interest *may* trigger a less deferential standard of review") (emphasis added).

Reading *Armstrong* through the lens of *Davolt*, this court notes that, in *Armstrong*, the court found a "perpetual conflict" warranting *de novo* review on the basis of the "continuing conflict in playing the dual role of administrator and insurer of the ... plan," *and* the presence of a "claims savings" incentives program for claims reviewers that violated the requirement of ERISA that the plan be administered "'solely in the interest of the participants and beneficiaries.'" *Armstrong*, 128 F.3d at 1265 (quoting 29 U.S.C. § 1104(a)(1)). Here, the "continuing conflict" is also present, because Aetna is once again the plan administrator and insurer, but the court concluded above that it could not assume the same "claims savings" incentives were still at work. Thus, while a conflict of interest exists, the evidence that Aetna is both the insurer and plan admin-

istrator is not sufficient, standing alone, to demonstrate a "perpetual conflict." *See Davolt,* 206 F.3d at 809.

Aetna argues that the decision in *Lawyer* demonstrates that any conflict of interest is not sufficiently "palpable" and "perpetual" to invoke less deferential review, when the supposed conflict is measured against Aetna's long-term business interest in not arbitrarily denying claims. In *Lawyer,*

> Hartford Life argue[d] that while its dual roles may not provide for total neutrality, its financial interest (as benefits payor) in Lawyer's benefits claim was minimal. At most, Hartford Life would have been liable for a total of $65,000 in benefits to Lawyer over a ten-year period. Considering the fact that Hartford Life's long-term business goals would not be well-served by routine denial of valid claims for benefits, the minimal financial impact that Lawyer's claim would have militates against a conflict of interest finding in this case.

*Lawyer,* 100 F.Supp.2d at 1009–1010 (citations omitted). Aetna argues that Mrs. West's $67,000 likewise has "minimal" impact on Aetna's financial interests. However, as Mrs. West contends, the *Lawyer* decision is distinguishable, because the $67,000 in accidental death benefits at issue in this case is payable in a lump sum, not over several years. *See id.* Nevertheless, the court finds that even this lump sum may provide only "minimal" financial impact upon Aetna, when Aetna's size and financial base are considered. What is more persuasive to the court is Mrs. West's contention that the conflict of interest here should not be considered only in light of her own claim for accidental death benefits, but in light of the impact of Aetna's definition of "accident" and denial of accidental death benefits under that definition upon all fatal automobile crash cases in which the decedent's intoxication is a significant contributing factor. The court agrees that, on this basis, there is sufficient evidence of a "perpetual conflict" in this case to impose some heightened scrutiny upon Aetna's determination, because that determination involves an interpretation of policy terms that may reach far beyond this particular case. *Cf. Armstrong,* 128 F.3d at 1265 (a systemic interest in claims savings demonstrated by "claims savings" incentives created a "perpetual" conflict of interest).

Moreover, the "connection" between the conflict of interest and the benefits determination in this case is direct and substantial. *See Heaser,* 247 F.3d at 833 (in addition to a "palpable conflict of interest," the claimant must show that the conflict of interest "caused a serious breach of the plan administrator's fiduciary duty to her"); *Woo,* 144 F.3d at 1161–62 (considering whether a conflict and irregularities "had a sufficient connection to the decision reached to trigger a less deferential review"). Interpretation of "accident" and application of that term, as interpreted, in cases involving the claims of intoxicated drivers for accidental death benefits in such a way as to deny those claims would be of direct financial benefit to Aetna, and the interest in avoiding such claims in the aggregate on a purportedly "valid" basis of plan interpretation is not ameliorated by long-term business interests or the relative smallness of any individual claim.

***ii. Procedural irregularity.*** Mrs. West also argues that Aetna engaged in procedural irregularities in the denial of her claim, because Aetna failed to apply New York law in arriving at its interpretation of "accident," even though application of New York law was required by the express terms of the UPS Plan. Mrs. West contends that Aetna ignored New York law, because application of New York law would have barred Aetna's interpretation

of "accident." Aetna argues that this is not the sort of "procedural irregularity" contemplated in *Woo*, because the evidence here is that Aetna thoroughly investigated Mrs. West's claim and there is no complaint about the way the claim was processed.

In *Woo*, the court found a "serious procedural irregularity," sufficiently connected to the benefits decision to add support to its conclusion that "sliding scale" review at the least deferential end was required, as follows:

> Hartford was confronted with medical evidence of an uncommon disease and the opinions of two treating physicians stating that, in retrospect, Woo had been disabled from her job before she resigned. We hold that, under these circumstances, Hartford failed to use proper judgment by not having a scleroderma expert review her claim.

*Woo*, 144 F.3d at 1161. The court agrees that there is some similarity between a failure to interpret a policy term in accord with the law applicable to the contract by virtue of a choice-of-law clause, as in this case, and the failure to employ a properly qualified expert to review a claim involving an uncommon disease, as in *Woo*. However, as will be discussed more fully below, the impact of a choice-of-law clause in an ERISA plan may be of less significance than it might be in another kind of insurance case. Therefore, the court cannot find a procedural error that is of sufficient gravity, standing alone, to invoke less deferential review or to heighten the level of scrutiny above what is required in light of Aetna's conflict of interest.

#### c. The appropriate degree of deference

When the plaintiff establishes that "less deferential" review is appropriate, as Mrs. West has done here on the basis of Aetna's "perpetual" conflict of interest, one panel of the Eighth Circuit Court of Appeals has held that the reviewing court should apply a "sliding scale" approach, under which the court "will decrease the deference given to the administrator in proportion to the seriousness of the conflict of interest or procedural irregularity." *Woo*, 144 F.3d at 1162–63 (adopting the "sliding scale" approach formulated in this way). Thus, when the question is whether there is "substantial evidence" to support an administrator's factual determination to deny benefits under the plan, "sliding scale" review requires that "the evidence supporting the plan administrator's decision must increase in proportion to the seriousness of the conflict or procedural irregularity." *Id.* The Eighth Circuit Court of Appeals does not appear to have applied the "sliding scale" approach to review of an administrator's interpretation of a plan. Nevertheless, it follows from the explanation of the "sliding scale" approach offered in *Woo* that the weight of each factor in the five-factor test favoring the administrator's interpretation of the plan must increase in proportion to the seriousness of the conflict or procedural irregularity. *Cf. Woo*, 144 F.3d at 1162 (defining the "sliding scale" approach in relation to a factual determination made by the administrator in light of a conflict of interest or procedural irregularity).

However, the court finds that the question of whether proof of a conflict of interest or procedural irregularity on the part of the plan administrator invokes only less deferential "sliding scale" review for "abuse of discretion," or instead invokes *de novo* review, is not altogether settled in this circuit. *Compare Armstrong*, 128 F.3d at 1265 (holding that the plan administrator's conflict of interest required the court "to review Aetna's decision to deny benefits de novo," over Judge Beam's dissent asserting that the review should be "sliding scale" review for abuse of discretion), *with Woo*, 144 F.3d at 1161–62 (opinion by Judge Beam, holding that "sliding

scale" review, rather than *de novo* review, is appropriate where a plan administrator has a conflict of interest, and that such a rule "adheres to" *Armstrong,* because in that decision "the egregious circumstances essentially required the court to give no deference to the administrator's decision"). *See also Heaser,* 247 F.3d at 833 (referring only to "less deferential review" without defining such review as *de novo* or "sliding scale" review for abuse of discretion, because the court found insufficient evidence of a conflict or irregularity); *Davolt,* 206 F.3d at 809 (recognizing that, when the claimant asserts that the plan administrator had a conflict of interest or engaged in procedural irregularities, the appropriate standard of review might be "arbitrary and capricious" review, *de novo* review, or "even one determined on an intermediate 'sliding scale,'" citing *Woo* ). Although the court finds that Aetna suffered from a conflict of interest in this case that is sufficiently connected to the benefits determination and sufficiently grave to deprive Aetna of fully deferential review, the court need not decide the precise proportion of deference due Aetna's determination under the "sliding scale" approach, nor must it decide whether the conflict is so "egregious" as to require only *de novo* review, until such time as it is clear that the standard of review would be outcome determinative. *See Davolt,* 206 F.3d at 809 ("We need not resolve this question [of the degree of deference or applicability of *de novo* review], however, because any standard of review ("even one determined on an intermediate 'sliding scale,' *see Woo,* 144 F.3d at 1161–62) will yield the same result"). Indeed, Mrs. West herself contends that, even if Aetna is entitled to fully deferential review for an abuse of discretion, Aetna's denial of benefits on the basis of its interpretation of "accident" under the UPS Plan was an abuse of discretion, in light of the five-factor test applied in *Finley,* 957 F.2d at 621. Therefore, the

court will consider, at least in the first instance, whether or not Aetna's decision can be upheld under a fully deferential review of its plan interpretation.

## B. Application Of The Five–Factor Test

As explained above, "[w]hen determining whether an administrator's interpretation of a plan is reasonable, [courts in this circuit] apply a five-factor test" derived from *Finley v. Special Agents Mut. Benefit Ass'n, Inc.,* 957 F.2d 617 (8th Cir.1992). *See, e.g., Farley,* 147 F.3d at 777 n. 6 (citing *Finley,* 957 F.2d at 621). However, before attempting to apply the five-factor test articulated in *Finley,* the court must first decide precisely how Aetna defined "accident" within the meaning of the accidental death benefits portion of the UPS Plan. This step is important, because the court finds that the parties have not clearly distinguished between Aetna's interpretation of the critical plan term and Aetna's evaluation of the facts in this case to determine the application of the Plan in light of the chosen definition of "accident."

### 1. Aetna's definition of "accident"

Mrs. West, in particular, seems to equate Aetna's definition of "accident" with its determination that the death of an intoxicated driver, in this case, is not an "accident." For example, in analyzing the first *Finley* factor, Mrs. West argues that "[t]here is no doubt that Aetna's decision to deny benefits cannot be consistent with the goals of the plan," where she argues that "Aetna denied payment of benefits in this case because [her] husband was intoxicated the night he was killed." *See* Plaintiff's Trial Brief at 10; *see also id.* at 16 (arguing that Aetna's definition of "accident" "reads in" an intoxication exclusion). However, the *Finley* factors are not applicable to determining whether the administrator's "decision" was reasonable, but to

"whether an administrator's *interpretation of a plan* is reasonable." *Farley,* 147 F.3d at 777 n. 6 (emphasis added); *Donaho,* 74 F.3d at 899–900 & n. 9; *Finley,* 957 F.2d at 621. To the extent that Mrs. West challenges Aetna's interpretation of "accident," she contends that Aetna is "utilizing" or "resurrecting" the outmoded "accidental means" test, which looks to the insured's conduct to determine if there was any intentional act by the decedent that increased the risk of harm and, if so, holds that the event causing death was not an "accident." *See* Plaintiff's Trial Brief at 10 and *passim.* Thus, she argues that Aetna's definition of "accident" simply excludes benefits where the decedent's death is "by reason of intoxication," because intoxication purportedly increased the risk of harm.

Aetna acknowledges that "accident" is not defined in the policy itself. *See* Defendant's Trial Brief at 9. Rather, Aetna contends that, in the discretion granted it under the policy, it defined "accident" as "an event which happens by chance, or fortuitously, without intention or design, and which is **unexpected, unusual and unforeseen.**" Defendant's Trial Brief at 9–10 (quoting June 15, 1998, Denial Letter at 2, Joint Appendix at 48, and October 5, 1998, Reaffirmation of Denial Letter at 2, Joint Appendix at 51, with emphasis added by Aetna in its brief); *see also id.* at 15 (reiterating this definition of "accident"). Aetna then argues that its denial of Mrs. West's claim was not based on any limitations indicated in the policy, but by virtue of the fact that Mr. West's death was not an "accident" within the meaning of the UPS Plan, as Aetna had defined the term. *Id.* at 9. Aetna next argues that "Mr. West's death was not unexpected, unusual, or unforeseeable," because "[i]t is undisputed that Mr. West intentionally consumed alcohol, and then chose to drive his vehicle in an intoxicated state." *Id.* at 10. While this last statement appears to be an

evaluation of facts to determine whether the UPS Plan is applicable, it also indicates that Aetna asserts ·that its definition of "accident" excludes the foreseeable consequences of intentional conduct, leading to its reasonable determination that the death of an intoxicated driver is a foreseeable consequence of intentional conduct. *See id.* at 10–13 (citing cases discussing the foreseeability of the death of an intoxicated driver).

The court agrees with the parties that "accident" is not expressly defined in the UPS Plan. *See* UPS Plan at 5, Joint Appendix at 10. The court also finds that the portion of the UPS Plan providing accidental death coverage does not include an "intoxication" exclusion, *id.,* although the court also finds that Aetna specifically eschewed reliance on any of the express limitations in the policy as the basis for its denial of Mrs. West's claim. *See* October 5, 1998, Reaffirmation of Denial Letter at 1, Joint Appendix at 50 ("Our denial of the claim for the accidental death benefit was not based on any of the limitations indicated in this provision."). Next, the court finds that Aetna defined "accident" in the June 15, 1998, Denial Letter, for purposes of determining Mrs. West's claim for accidental death benefits under the UPS Plan as "an event which happens by chance, or fortuitously, without intention or design, and which is unexpected, unusual and unforeseen." *See* June 15, 1998, Denial Letter at 2, Joint Appendix at 48; *see also supra* at 8. Further, the court finds that Aetna's denial of benefits in this case was based on Aetna's finding that Mr. West's death was *not* "unforeseen." Specifically, immediately following the definition of "accident" in the June 15, 1998, Denial Letter, Aetna's investigator wrote, "In theis [sic] situation, the insured should have foreseen the consequences of drinking and operating a motor vehicle while intoxicated." *Id.* Thus, among the key questions in this

review of Aetna's interpretation of the plan, in addition to the "reasonableness" of Aetna's interpretation of "accident," is the reasonableness of Aetna's interpretation of "unforeseen" as defining an essential element of an "accident."

The court finds that Aetna's definition of "foreseeability" for the purposes of denial of Mrs. West's claim under the accidental death benefits portion of the UPS Plan can be found in the paragraph of the June 15, 1998, Denial Letter preceding the paragraph defining "accident." In that paragraph, Aetna's investigator states, "Mr. West's intentional act exposed himself to unnecessary risks which were reasonably foreseeable and such that he should have known or appreciated the consequences of his intentional acts, including the liklihood [sic] or strong possibility of death." *Id.* This is a factual determination by Aetna that the UPS Plan is inapplicable, but it is clearly a factual determination made *against a standard of "foreseeability,"* which Aetna later identifies as the decisive factor for finding that Mr. West's death was not an "accident" within the meaning of the UPS Plan. Parsing the plain language of this definition of "foreseeability" further, the court finds that, under Aetna's definition, a fatality is not "unforeseen," and hence not an "accident," if (1) the decedent committed an "intentional act"; (2) the "intentional act exposed [the decedent] to unnecessary risk"; and (3) the "unnecessary risks ... were reasonably foreseeable," that is, the decedent "should have known or appreciated the consequences of his intentional acts." [4] Howev-

er, the definition of "foreseeability" does not *require* that the "consequences" that must be foreseen be "the lik[e]lihood or strong possibility of death"; rather, the definition states only that "consequences" be foreseen, *"including* the lik[e]lihood or strong possibility of death." *Id.* (emphasis added).

In short, the court must apply the *Finley* factors to determine the "reasonableness" of Aetna's interpretation of the plan term "accident" as meaning "an event which happens by chance, or fortuitously, without intention or design, and which is unexpected, unusual and unforeseen," including the "reasonableness" of Aetna's interpretation of "foreseeability" as a key element of its definition of "accident."

## 2. Consideration of the definition in light of the Finley factors

Again, the five factors in the *Finley* test to determine the reasonableness of a plan administrator's interpretation of a plan term are the following:

[1] whether [the plan administrator's] interpretation is consistent with the goals of the Plan, [2] whether [the plan administrator's] interpretation renders any language in the Plan meaningless or internally inconsistent, [3] whether [the plan administrator's] interpretation conflicts with the substantive or procedural requirements of the ERISA statute, [4] whether [the plan administrator] ha[s] interpreted the words at issue consistently, and [5] whether [the plan administrator's] interpretation is contrary to

4. The language of this phrase of Aetna's definition of "foreseeability" is particularly awkward, because the investigator used the conjunction "and" between "reasonably foreseeable" and "such that he should have known or appreciated the consequences of his intentional acts," *see* June 15, 1998, Denial Letter at 2, Joint Appendix at 48, thereby seeming to suggest that "reasonable

foreseeability" and "should have known or appreciated" are somehow different things. The court, however, is unable to discern any real distinction in meaning between "reasonable foreseeability" and "should have known or appreciated" at anything but a semantic level. Both plainly suggest an "objective" standard of foreseeability, as shall be discussed in more detail *infra.*

the clear language of the Plan. *See de Nobel v. Vitro Corp.,* 885 F.2d 1180, 1188 (4th Cir.1989) (citing cases).

*Finley v. Special Agents Mut. Benefit Ass'n, Inc.,* 957 F.2d 617, 621 (8th Cir. 1992). The court finds nothing in the factors themselves, the decision in *Finley,* or subsequent decisions suggesting that consideration of these factors must be sequential. Rather, the court deems it appropriate here to consider the factors in a manner consistent with their relative impact upon the ultimate determination of the "reasonableness" of Aetna's interpretation of "accident" within the meaning of the UPS Plan. Consequently, in this case, the court begins its analysis of the *Finley* factors with the third one, concerning conflict with ERISA. It is this factor that the court finds is the focus of the majority of the arguments asserted by the parties, even if those arguments were ostensibly offered in relation to other *Finley* factors, and the court agrees that this factor is the one warranting the most detailed consideration in this case.

### a. Conflict with ERISA

*i. Arguments of the parties.* Mrs. West argues that Aetna's definition of "accident," which she contends is a reincarnation of the "accidental means" test, is contrary to the developing federal common law that controls interpretation of ERISA plans. She cites several decisions involving ERISA plans specifically rejecting definitions of "accident" similar to Aetna's or holding that a death resulting from intentional conduct was nevertheless "accidental." She also argues that reliance on this "secret" definition of "accident," rather than including it in the express terms of the UPS Plan or including an express "intoxication" exclusion, violates the requirement that ERISA plans inform participants of the circumstances in which their claims can be denied. Moreover, she argues that a "secret" definition of "acci-

dent" that allows the plan administrator to deny claims on a whim is contrary to the goal of ERISA to provide benefits for plan participants. Indeed, she contends that Aetna's "accidental means" test practices a deception on the public.

In response, Aetna asserts that the denial of Mrs. West's claim in this case was not by virtue of the "accidental means" test, as she asserts, but solely on the basis of Aetna's determination that Mr. West's death did not meet the definition of an accident as required by the insuring clause of the UPS Plan. Aetna asserts further that this definition is not contrary to the applicable federal common law, because it is in accord with several cases holding that a traffic death as the result of voluntary intoxication was not an "accident" within the meaning of an ERISA plan or holding that the consequences of intentional acts of the insured are not "accidental" where the resulting harm can be reasonably foreseen.

To determine whether Aetna's definition of "accident" is consistent with the substantive or procedural requirements of ERISA, the court must first identify the rules of interpretation for ERISA plans.

*ii. Rules of interpretation for ERISA plans.* "ERISA is a broad, comprehensive regulation that preempts state laws relating to employee benefit plans, 29 U.S.C. § 1144(a), unless the state law in question 'regulates insurance, banking, or securities.' " *Brewer v. Lincoln Nat'l Life Ins. Co.,* 921 F.2d 150, 153 (8th Cir.1990) (quoting 29 U.S.C. § 1144(b)(2)(A)), *cert. denied,* 501 U.S. 1238, 111 S.Ct. 2872, 115 L.Ed.2d 1038 (1991). Therefore, where no particular ERISA section governs, courts are obliged to look to federal common law, rather than state law, in consideration of plan terms in ERISA cases. *McDaniel v. Medical Life Ins. Co.,* 195 F.3d 999, 1002 (8th Cir.1999) (citing *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S.Ct. 1549,

95 L.Ed.2d 39 (1987), and *Reid v. Connecticut General Life Ins. Co.*, 17 F.3d 1092, 1098 (8th Cir.1994), which states, "[W]here there is no federal statutory law to apply in ERISA litigation, 'federal common law,' not state law, should be applied."). This is true even when the ERISA plan contains a choice-of-law provision selecting the law of a specific state. Under the law of this circuit, "parties may not contract to choose state law as the governing law of an ERISA-governed benefit plan." *See Prudential Ins. Co. of Am. v. Doe*, 140 F.3d 785, 791 (8th Cir.1998). "Although the choice of law provisions may be relevant in a diversity action, [courts of this circuit] are required to apply federal common law when deciding federal questions," such as the question of coverage under an ERISA-governed plan providing accidental death benefits. *Cf. id.* (examining coverage under an ERISA-governed plan providing mental health benefits). Thus, the definition of "accident" under the law identified in any choice-of-law provision in the UPS Plan is not controlling and any inconsistency of Aetna's definition of "accident" with the definition under the law of the selected state may be of little moment, standing alone, in determining the "reasonableness" of Aetna's interpretation of the term.

■ On the other hand, in *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322 (8th Cir.1995), the Eighth Circuit Court of Appeals addressed the question of the impact of a choice-of-law provision in an ERISA plan selecting the law of Arkansas, as follows:

> In the present case, we need look no further than *Brewer [v. Lincoln Nat'l Life Ins. Co.*, 921 F.2d 150 (8th Cir. 1990), *cert. denied*, 501 U.S. 1238, 111 S.Ct. 2872, 115 L.Ed.2d 1038 (1991) ]. In applying the federal common law rule announced in *Brewer*, we must accord the [undefined] term "arising from any employment" its ordinary, not special-

ized, meaning. *Id.* To rely on the specialized legal definition of the term "arising out of employment," as it has been liberally applied in Arkansas workers' compensation "traveling salesperson" cases, would be contrary to the provisions of ERISA because that legal definition is not consistent with what an average plan participant would understand the words to mean. *See* 29 U.S.C. § 1022(a)(1).

*Mansker*, 54 F.3d at 1327. Thus, the question is not so much whether the choice-of-law provision is "controlling," but whether the definition of a disputed term required by the law of the chosen forum is only a "specialized legal definition of the term" or is instead consistent with ERISA. *Cf. id.* Indeed, as the Eighth Circuit Court of Appeals has also explained, "[a]lthough federal common law is applicable to [ERISA] case[s], [courts] may look to state law for guidance, provided state law does not conflict with ERISA or its underlying policies." *McDaniel*, 195 F.3d at 1002 (citing *Mohamed v. Kerr*, 53 F.3d 911, 913 (8th Cir.), *cert. denied*, 516 U.S. 868, 116 S.Ct. 185, 133 L.Ed.2d 123 (1995)); *Mansker*, 54 F.3d at 1326 ("In fashioning federal common law under ERISA, including principles that govern the legal effect of plan terms, courts may look to state law for guidance so long as the state law is not contrary to the provisions of ERISA.") (citing *Brewer*, 921 F.2d at 153).

As to specific principles of federal common law applicable to interpretation of ERISA plans, the Eighth Circuit Court of Appeals explained the following in *Brewer*:

> [The insurer] was required to furnish plan descriptions "written in a manner calculated to be understood by the average plan participant...." 29 U.S.C. § 1022(a)(1). It would be improper and unfair to allow experts to define terms that were specifically written for and

targeted toward laypersons. *This requirement provides a source from which we may fashion a federal common law rule; the terms should be accorded their ordinary, and not specialized, meanings.*

*Brewer,* 921 F.2d at 154 (emphasis added); *see also Mansker,* 54 F.3d at 1326–27 (quoting *Brewer*). Thus, in the first instance, the court must determine whether Aetna's definition of "accident" is consistent with the substantive provisions of ERISA by examining whether the definition is consistent with the "ordinary" meaning of the term.

***iii. "Ordinary" meaning of "accident."*** Unfortunately, there is probably no "ordinary" meaning of "accident" upon which all reasonable people could agree. The First Circuit Court of Appeals recognized this problem in a decision upon which both parties extensively rely, *Wickman v. Northwestern National Insurance Company,* 908 F.2d 1077 (1st Cir.), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990):

> Defining accident has troubled the state and federal judiciaries for years. Probably the best definition is Cardozo's tautology that an accident is what the public calls an accident, [*see Landress v. Phoenix Mut. Life Ins. Co.,* 291 U.S. 491, 499, 54 S.Ct. 461, 78 L.Ed. 934 (1934) (Cardozo, J., dissenting),] which aids jurists in deciding individual cases only slightly. As the late Justice Musmanno of the Pennsylvania Supreme Court bemused:
>
> > What is an accident? Everyone knows what an accident is until the word comes up in court. Then it becomes a mysterious phenomenon, and, in order to resolve the enigma, witnesses are summoned, experts testify, lawyers argue, treatises are consulted and even when a conclave of twelve world-knowledgeable individuals agree

as to whether a certain set of facts made out an accident, the question may not yet be settled, and it must be reheard in an appellate court.

*Brenneman v. St. Paul Fire and Marine Ins. Co.,* 411 Pa. 409, 192 A.2d 745, 747 (1963); *see Burr v. Commercial Travelers Mut. Acc. Ass'n,* 295 N.Y. 294, 301, 67 N.E.2d 248, 166 A.L.R. 462, 466 (N.Y.1946) ("Philosophers and lexicographers have attempted definition with results which have been productive of immediate criticism. No doubt the average man would find himself at a loss if asked to formulate a written definition . . . ."). Much of the inconsistency in the case law defining and applying the definition of accident is traceable to the difficulty in giving substance to a concept which is largely intuitive.

*Wickman,* 908 F.2d at 1086–87, 1084 (also describing what is an accident as a "metaphysical conundrum"); *Mullaney v. Aetna U.S. Healthcare,* 103 F.Supp.2d 486, (D.R.I.2000) ("It is clear . . . that the word 'accident,' when used in the context of an insurance policy, does not have a plain and ordinary meaning."). Therefore, the court must look elsewhere for guidance on the question of whether Aetna's definition of "accident" conflicts with the substantive requirements of ERISA, turning next to federal common law and, where appropriate, looking to state law for guidance. *See McDaniel,* 195 F.3d at 1002.

***iv. Federal decisions defining "accident" for purposes of ERISA plans.*** In quest of a federal common-law meaning for "accident," both parties rely extensively on *Wickman* as the seminal federal decision on the question. In *Wickman,* the plaintiff's decedent was seen standing on the outside of the guardrail of a bridge, holding on to the guardrail with only one hand, then free-falling to the railroad tracks some forty or fifty feet below. *Wickman,*

908 F.2d at 1080. Although he survived the fall, plaintiff's decedent later died, but not before telling hospital personnel that he had jumped off the bridge. *Id.* at 1080. The accidental death provisions of an ERISA plan provided by the decedent's employer defined accident as "an unexpected, external, violent and sudden event," *id.*, which the court described with remarkable understatement as "somewhat less than dispositive." *Id.* at 1084. The plan also specifically excluded "suicide or intentionally self-inflicted injury, whether ... sane or insane." *Id.* at 1081. The insurer denied a claim for accidental death benefits. *Id.*

In litigation that followed, a magistrate judge concluded that the plaintiff's decedent had projected himself over the void intending to commit suicide or seriously injure himself, either of which would fall within policy exclusions, or had so positioned himself, but then fallen inadvertently or mistakenly. *Id.* at 1083. The magistrate judge concluded that even this last possibility did not constitute an "accident":

> Assuming arguendo the third scenario, an inadvertent or mistaken fall, [the magistrate judge] held that even if Wickman had no specific intent to injure or kill himself, "the harm that befell him was substantially certain to happen." Once Wickman intentionally climbed over the guardrail and suspended himself with one hand, the magistrate found that serious bodily injury was substantially certain. This, he found, is not a case where the insured "intentionally did an act with some unexpected result." He therefore concluded as a matter of law that the insured did not lose his life due to an accident as defined under the policy or Massachusetts law.

*Wickman*, 908 F.2d at 1083–84. The First Circuit Court of Appeals agreed that the first two scenarios did not constitute "acci-

dents," but found that the third left "more vexing questions." *Id.* at 1084.

Although the parties in *Wickman* agreed that the decedent's fall fit the definition of "accident" in the plan, at least under the third scenario, to the extent that it was "an ... external, violent, and sudden event," they disagreed over whether it was "unexpected." *Id.* at 1085. The First Circuit Court of Appeals concluded that *"[t]he question comes down to what level of expectation is necessary for an act to constitute an accident; whether an intentional act proximately resulting in injury or only the ultimate injury itself must be accidental." Id.* (emphasis added). The court's extensive analysis of this question, which deserves careful attention here, began as follows:

> *A survey of state judicial interpretations of "accidental" reveals that there are essentially two approaches to determining whether an injury was "unexpected" and thus "accidental." In developing federal common law, it would be jurisprudential to analyze each of these approaches and determine which is the soundest and most consonant with the spirit of ERISA in promoting fair and equitable settlements of claims, as well as in promoting the formation of employee benefit plans. See Pilot Life,* 481 U.S. at 54, 107 S.Ct. at 1556.
>
> *The first approach distinguishes between accidental means and accidental results. Under this approach, where the insurance contract insures against "accidental means," the means which produced death or injury must have been unintentional. According to this interpretation, if the act proximately leading to injury is intentional, then so is the result, even if the result itself was neither intended nor expected. To constitute an accident under this standard, the cause of the injury, as Couch ex-*

*plains, must be "unforeseen, unexpected, and unusual; happening or coming by chance without design, that is casual or fortuitous, as opposed to designed or intended."* 10 *Couch on Insurance 2d* § 41:28, 40 (1982).

A court only will focus on "accidental means," though, if the language of the contract specifically speaks of accidental means. The contract in this case defines an accident in terms of an event. This would be the type of language which would prompt courts recognizing the distinction between "means" and "results" to look at the "means," because only the means can be termed an event. These courts would reason that if the contract had intended a "result" analysis, it would have spoken of an unexpected injury, not an unexpected event. Similarly, "violent, external, and sudden" terms concentrate upon the cause of the injury, not upon the injury itself.

The United States Supreme Court, in a landmark case, applied the means/result distinction and determined that a man who died of heat stroke while golfing had not died of accidental means. The Court reasoned that because the insured had intentionally played golf and exposed himself to the hot sun for a long period of time, the means of his death, overexposure to the sun, was not accidental. *Landress v. Phoenix Mutual Life Ins. Co.*, 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934 (1934). Justice Cardozo dissented, harshly criticizing the "artificial" distinction between accidental means and results. He noted that:

> "Probably it is true to say that in the strictest sense and dealing with the region of physical nature there is no such thing as an accident." Halsburg, L.C. in *Brintons v. Turvey*, L.R. [1905].... On the other hand, the average man is convinced that there is, and so certainly is the man who takes out a policy of accident insurance. It

is his reading of the policy that is to be accepted as our guide, with the help of the established rule that ambiguities and uncertainties are to be resolved against the company.

. . . . .

> When a man has died in such a way that his death is spoken of as an accident, he has died because of an accident, and hence by accidental means.

*Id.* at 499 (citations omitted). Cardozo forewarned that adherence to the distinction would "plunge this branch of the law into a Serbonian Bog." *Id.*

Time has borne out Cardozo's prediction. As the Texas Supreme Court has noted:

> Texas courts have waded through Justice Cardozo's Serbonian bog, and we are now convinced that the terms "accidental death" and "death by accidental means," as those terms are used in insurance policies, must be regarded as legally synonymous....

*Republic National Life Insurance Company v. Heyward,* 536 S.W.2d 549 (Tex. 1976); *see also Beckham v. Travelers Ins. Co.,* 424 Pa. 107, 225 A.2d 532, 535 (1967) ("Our own cases have also confirmed Cardozo's prediction...."). Other courts have been equally frustrated by the means/injury distinction, which has "shrouded [this branch of law] in a semantic and polemical maze," and forced courts applying the distinction to resort to "tortuous and tortured legal jiujitsu." Annotation, *Insurance: "Accidental Means" as Distinguishable from "Accident," "Accidental Result," "Accidental Death," "Accidental Injury," etc.,* 166 A.L.R. 469, 477 (1947).

*In recent years, courts consistently have rejected the distinction between accidental means and accidental results* noting that:

it is illogical to purport to distinguish between the accidental character of the result and the means which produce it; that the distinction gives to "accidental means" a technical definition which is not in harmony with the understanding of the common man; and that the ambiguity found in the concept should be resolved against the insurer so as to permit coverage.

10 *Couch on Insurance 2d* § 41:31, 50 (1982); *see also Page Flooring and Constr. Co. v. Nationwide Life Ins. Co.,* 840 F.2d 159, 162 (1st Cir.1988) (Coffin, J., dissenting) (urging the interpretation prevailing in an increasing number of jurisdictions that the two terms be construed as synonymous and rejecting the distinction between "accidental means" and "accidental results" as artificial and confusing). *Having reviewed the pertinent state court decisions, we conclude that the better reasoning rejects the distinction.* Thus, we elect to pursue a path for the federal common law which safely circumvents this "Serbonian Bog."

*Wickman,* 908 F.2d at 1085–86 (footnotes omitted; emphasis added).

In *Wickman,* the court concluded that rejection of the distinction between "accidental means" and "accidental results" did not resolve the dispute in that case, because "we are still left with questions concerning the standards by which to judge the insured's expectations." *Id.* at 1086. Turning to those questions, the court first noted the following:

Case law is fairly consistent in defining an accident, using equally ambiguous terms such as undesigned, unintentional, and unexpected. *See Beacon Textiles Corp. v. Employers Mut. Liab. Ins. Co.,* 355 Mass. 643, 246 N.E.2d 671, 673 (1969); 1A *Appleman, Insurance Law and Practice* § 360, 449 (1982). The contract at issue here uses the term "unexpected." These terms offer no

guidance in determining from whose perspective they should be judged. *The common law has filled this gap, to a certain extent, by prescribing that these terms should be judged from the viewpoint of the insured. See Id.* at 450–52; *Estate of Wade v. Continental Ins. Co.,* 514 F.2d 304, 306–07 (8th Cir.1975).

*Wickman,* 908 F.2d at 1087 (emphasis added). The court rejected the plaintiff's contention that, in light of the common-law rule that expectation should be judged from the viewpoint of the insured, unless the plaintiff "actually expected to die, essentially that he specifically intended to commit suicide, his death must be considered an accident." *Id.* The court found two difficulties with this argument. "The first difficulty," the court explained, "comes in cases where an insured's expectations, virtually synonymous with specific intent, are patently unreasonable." *Id.* "The second difficulty with a test relying upon actual expectation is that actual expectation is often difficult, if not impossible, to determine." *Id.* However, the court continued, "[n]otwithstanding these problems, we do not suggest actual expectation should be wholly ignored, for in most cases actual expectations govern the risks of an insurance policy a beneficiary believes has been purchased." *Id.* at 1088. Thus, the court in *Wickman* concluded that "the reasonable expectations of the insured when the policy was purchased is the proper starting point for a determination of whether an injury was accidental under its terms." *Id.*

The court in *Wickman* then laid out an analytical process for determining whether the insured's death or injury was an "accident" based on (1) determination of the insured's actual expectations, and (2) determination of whether the insured's actual expectations were reasonable from an objective viewpoint, as follows:

If the fact-finder determines that the insured did not expect an injury similar in type or kind to that suffered, the fact-finder must then examine whether the suppositions which underlay that expectation were reasonable. This analysis will prevent unrealistic expectations from undermining the purpose of accident insurance. If the fact-finder determines that the suppositions were unreasonable, then the injuries shall be deemed not accidental. The determination of what suppositions are unreasonable should be made from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences.

Finally, if the fact-finder, in attempting to ascertain the insured's actual expectation, finds the evidence insufficient to accurately determine the insured's subjective expectation, the fact-finder should then engage in an objective analysis of the insured's expectations. *In this analysis, one must ask whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct.* An objective analysis, when the background and characteristics of the insured are taken into account, serves as a good proxy for actual expectation. Requiring an analysis from the perspective of the reasonable person in the shoes of the insured fulfills the axiom that accident should be judged from the perspective of the insured.

*Wickman,* 908 F.2d at 1088 (citations omitted; emphasis added).

■ The *Wickman* decision is important for a number of reasons here, but most particularly for the near uniformity with which courts in ERISA cases involving intoxicated drivers have since relied on *Wickman* to reject the "accidental means" test as a definition of "accident," and have instead embraced the *Wickman* definition of "accident" as depending upon whether or not death or injury as the result of an intentional act was actually expected by the insured, and if not, whether the insured's expectations were reasonable applying an objective standard, stated in terms of "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as *highly likely to occur* as a result of the insured intentional conduct." *See Wickman,* 908 F.2d at 1088 (emphasis added). *Accord Cozzie v. Metropolitan Life Ins. Co.,* 140 F.3d 1104, 1110 (7th Cir. 1998); *Mullaney v. Aetna U.S. Healthcare,* 103 F.Supp.2d 486, 492–94 (D.R.I. 2000); *Walker v. Metropolitan Life Ins. Co.,* 24 F.Supp.2d 775, 780–82 (E.D.Mich. 1997); *Cates v. Metropolitan Life Ins. Co., Inc.,* 14 F.Supp.2d 1024, 1027 (E.D.Tenn. 1996), *aff'd,* 149 F.3d 1182 (6th Cir.1998) (table op.); *Schultz v. Metropolitan Life Ins. Co.,* 994 F.Supp. 1419, 1421–22 (M.D.Fla.1997); *Metropolitan Life Ins. Co. v. Potter,* 992 F.Supp. 717, 728–29 (D.N.J. 1998); *Nelson v. Sun Life Assur. Co. of Canada,* 962 F.Supp. 1010, 1012–13 (W.D.Mich.1997);[5] *Miller v. Auto–Alliance Int'l, Inc.,* 953 F.Supp. 172, 175–76

---

**5.** *Nelson* makes a rather peculiar reference to *Wickman:*

While Justice Cardozo's dissent in *Wickman* presents a well-articulated legal analysis in and of itself, the better-reasoned, subsequent cases with facts more closely aligned to those in the case at bar, adopt the view set forth in *Wickman's* majority opinion.

*Nelson,* 962 F.Supp. at 1012. Justice Cardozo, of course, dissented in *Landress,* not *Wickman;* indeed, there is no dissent in *Wickman.* Moreover, the *Wickman* decision, like decisions after *Landress,* actually *adopts* the position articulated by Justice Cardozo in his dissent in *Landress.*

(E.D.Mich.1997); *Fowler v. Metropolitan Life Ins. Co.*, 938 F.Supp. 476, 480 (W.D.Tenn.1996). *But see Buce v. Allianz Life Ins. Co.*, 247 F.3d 1133, 1147 (11th Cir.2001) ("[D]eploy[ing] the federal common law of ERISA to give some unity to the concept of 'accident' is sound judicial policy [and] the First Circuit [Court of Appeals in *Wickman*] was on eminently sound ground in ruling out 'accidental means' and focusing instead on the objectively reasonable expectations of a person in the perilous situation that the decedent had placed himself in," but *"Wickman's* rejection of 'accidental means' does not ... rule the case of Walter Buce," because the "vague terms of the policy" were "given cognizable doctrinal context by another provision of the policy" selecting Georgia law, which embraces the "accidental means" test"). This uniformity is apparent even where courts differ on the specific question of whether or not the death of an intoxicated driver was an "accident" within the meaning of an ERISA plan. *Compare Potter,* 992 F.Supp. at 729 (there was insufficient evidence to determine whether, as a matter of law, an intoxicated driver's death was an "accident" under the *Wickman* test),[6] *with Cozzie,* 140 F.3d at 1110 (the death of an intoxicated driver was not an accident under the *Wickman* test); *Mullaney,* 103 F.Supp.2d at 494; *Walker,* 24 F.Supp.2d at 781–82; *Cates,* 14 F.Supp.2d at 1027; *Schultz,* 994 F.Supp. at 1421–22; *Nelson,* 962 F.Supp. at 1013; *Miller,* 953 F.Supp. at 176–77; *Fowler,* 938 F.Supp. at 480. Indeed, the *Wickman* test of what constitutes an "accident" within the meaning of an ERISA plan that does not otherwise unambiguously define the term has been employed in the context of other kinds of conduct, besides driving while intoxicated. *See Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1456 (5th Cir.1995) (op. by White, Assoc. Justice, retired) (applying the *Wickman* test, described as a test of reasonable foreseeability or reasonable expectation, to death during autoerotic asphyxiation, and holding that such a death was an "accident"); *McAfee v. Transamerica Occidental Life Ins. Co.*, 106 F.Supp.2d 1331, 1341 (N.D.Ga.2000) (where the decedent was shot by police while brandishing a rifle, his death was not an "accident" under *Wickman,* because a reasonable person should have known that serious bodily injury was a probable consequence substantially likely to occur as a result of his actions); *Chinea v. Continental Cas. Co.*, 981 F.Supp. 719, 725 (D.P.R. 1997) ("The court therefore holds that a person that dies as a consequence of being a crime victim, there being no evidence that the victim was involved in crime or in the criminal activity, complies with the definition of "accident" adopted by the First Circuit [Court of Appeals] in *Wickman* — an act that is 'undesigned, unintentional and unexpected' 'judged from the viewpoint of the insured.' "); *Bennett v. American Int'l Life Assur. Co. of New York,* 956 F.Supp. 201, 209–211 (N.D.N.Y.1997) (adopting the@ *Wickman* test as articulated in *Todd* in a case of autoerotic asphyxiation); *Lincoln Nat'l Life Ins. Co. v. Evans,* 943 F.Supp. 564, 567–71 (D.Md.1996) (applying the *Wickman* test to determine whether an allegedly abusive husband who was burned to death by his wife had died of an "accident"); *Parker v. Danaher Corp.*, 851 F.Supp. 1287, 1292–95 (W.D.Ark.1994) (applying *Wickman* to de-

---

**6.** In *Schreck v. Reliance Standard Life Ins.,* 104 F.Supp.2d 1373, 1376–77 (S.D.Fla.2000), the court considered, under *Wickman,* whether the death of an intoxicated passenger, who opened the door on a moving car and fell to his death, was an "accident," and remanded on the ground that the insurer had failed to investigate adequately the circumstances of the incident before denying benefits, but did so without comment on the foreseeability of intoxication resulting in such a traffic fatality.

termine whether a death by autoerotic asphyxiation was an "accident"); *but see Howard v. National Educ. Ass'n of New York,* 984 F.Supp. 103, 108 (N.D.N.Y.1997) (distinguishing *Wickman* in the case of a sudden heart attack, because "the problem with a definition of accidental death that relies exclusively on the foreseeability of the event is that any death resulting from natural causes must then be considered an accident. Common sense, however, dictates that the common understanding of 'accidental' is not so broad."). Thus, the court finds that *Wickman* may be treated as a statement of federal common law for the definition of "accident" under an ERISA plan in which the term is not unambiguously defined.

**■ v. Consistency of Aetna's definition with Wickman.** Although the key concept in defining "accident" in *Wickman* was described as "expectation," while the court concluded above that the key concept in this case, based on Aetna's denial, was "foreseeability," the court finds that there is nothing more than a semantic difference between those two concepts here: Both concepts plainly involve the degree to which the insured did or reasonably should have "foreseen" or "expected" the injury he or she sustained. *See, e.g., Cozzie,* 140 F.3d at 1110 (describing *Wickman* as applying a "reasonable foreseeability" test). Thus, to the extent that Aetna's definition of "accident" depends upon a definition of "foreseeability" or "unforeseen" that is at odds with the *Wickman* definition of "expectation" or "unexpected," it is at odds with the substantive law of ERISA. *See Finley,* 957 F.2d at 621 (defining the third relevant factor for determination of the reasonableness of the administrator's plan interpretation as "whether [the plan administrator's] interpretation conflicts with the substantive or procedural requirements of the ERISA statute").

Although Aetna protests that it has not employed an "accidental means" test contrary to *Wickman,* but has instead simply defined "accident" within the meaning of the UPS Plan, and then denied benefits in this case because Mr. West's death was not an "accident," as that term is defined, the court is not persuaded. Rather, the court finds that Aetna's definition of "accident"—as "an event which happens by chance, or fortuitously, without intention or design, and which is unexpected, unusual and unforeseen," June 15, 1998, Denial Letter at 2, Joint Appendix at 48; October 5, 1998, Reaffirmation of Denial Letter at 2, Joint Appendix at 51—is almost precisely the definition of "accident" identified in *Wickman* as embodying the "accidental means" test. *See Wickman,* 908 F.2d at 1085 ("To constitute an accident under this ['accidental means'] standard, the cause of the injury, as Couch explains, must be 'unforeseen, unexpected, and unusual; happening or coming by chance without design, that is casual or fortuitous, as opposed to designed or intended.' ") (citing 10 COUCH ON INSURANCE 2D § 41:28, 40 (1982)). Moreover, the court in *Wickman* noted that the language in the contract before it "defines an accident in terms of an event," which the court observed "would be the type of language which would prompt courts recognizing the distinction between 'means' and 'results' to look at the 'means,' because only the means can be termed an event." *Id.* Courts relying on an "accidental means" test, the *Wickman* court explained further, "would reason that if the contract had intended a 'result' analysis, it would have spoken of an unexpected injury, not an unexpected event." *Id.* Here, Aetna's definition of "accident" also speaks in terms of "an event," not an "injury." Thus, it plainly invokes the "accidental means" standard, notwithstanding Aetna's protestations to the contrary.

However, Aetna also argues that its definition properly formulates the "reasonable expectation" or "reasonable foreseeability" test adopted by *Wickman,* and thus is consistent with federal common-law as embodied in *Wickman.* This argument is likewise unpersuasive when the language of Aetna's definition of "foreseeability" is subjected to more than superficial scrutiny. Aetna's standard states that *the decedent* "should have known or appreciated the consequences of his intentional acts." June 15, 1998, Denial Letter at 2, Joint Appendix at 48. Thus, Aetna's definition does state that "foreseeability" should be "judged from the viewpoint of the insured," as required by the formulation of the common law in *Wickman. See Wickman,* 908 F.2d at 1087–88 (the common law requires that expectation "be judged from the view point of the insured"). Moreover, Aetna's definition of "foreseeability" embodies the appropriate "reasonableness" standard, to the extent that it can be read to equate "reasonable foreseeability" and "knew or should have appreciated the consequences of his intentional acts." June 15, 1998, Denial Letter at 2, Joint Appendix at 48. As the First Circuit Court of Appeals explained in *Wickman,* "Legally, 'should have known' is synonymous with, if not even a higher standard than, the reasonable expectation standard we promulgated above." *Wickman,* 908 F.2d at 1089 (finding *no error* where the magistrate judge used such a "knew or should have known" standard to determine the reasonableness of the decedent's expectations).

However, Aetna's definition does not begin with the decedent's *actual expectation. See Wickman,* 908 F.2d at 1088. Instead, it turns immediately to the question of whether the decedent's expectation was "reasonable," from the objective perspective of whether the decedent "should have known or appreciated the consequences of his intentional acts." *See* June 15, 1998,

Denial Letter at 2, Joint Appendix at 48. The First Circuit Court of Appeals stated in *Wickman,* that "[i]f the fact-finder determines that the insured did not expect an injury similar in type or kind to that suffered, the fact-finder must *then* examine whether the suppositions which underlay that expectation were reasonable." *Wickman,* 908 F.2d at 1088 (emphasis added). Consequently, "if the fact-finder, in attempting to ascertain the insured's *actual expectation,* finds the evidence insufficient to accurately determine the insured's subjective expectation, *the fact-finder should then engage in an objective analysis of the insured's expectations." Id.* (emphasis added). Aetna's definition does not involve both steps in the *Wickman* test.

The most glaring failure in Aetna's definition of "foreseeability," however, is in what, precisely, the insured should have foreseen under an objective standard. *Wickman* formulates the requirement as "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury *as highly likely to occur as a result of the insured's intentional conduct." Id.* (emphasis added). In contrast, Aetna's formulation is only that the decedent "should have known or appreciated the consequences of his intentional acts." June 15, 1998, Denial Letter at 2, Joint Appendix at 48. As the court explained above, Aetna's definition of "foreseeability" does not *require* that the "consequences" that must be foreseen be "the lik[e]lihood or strong possibility of death"; rather, the definition states only that "consequences" must be foreseen, "*including* the lik[e]lihood or strong possibility of death," but also presumably including such lesser consequences as a broken fingernail. *Id.* (emphasis added). A formulation that is analogous to the *Wickman* formulation in this regard would have been that "[the

decedent's] intentional act exposed himself to unnecessary risks which were reasonably foreseeable [meaning] that he [or she] should have known or appreciated [that] the consequences of his [or her] intentional acts [were] the lik[e]lihood or strong possibility of death." *And compare Wickman,* 908 F.2d at 1088 ("[O]ne must ask whether a reasonable person … *would have viewed the injury as highly likely to occur* as a result of the insured's intentional conduct.") (emphasis added). The fact that the foresight of the consequences of "the lik[e]lihood or strong possibility of death" are not *required* by Aetna's definition is further demonstrated by Aetna's finding that Mr. West's death was not an "accident" as that term was defined by Aetna, because "[i]n theis [sic] situation, the insured should have foreseen *the consequences* of drinking and operating a motor vehicle while intoxicated," *see* June 15, 1998, Denial Letter at 2, Joint Appendix at 48, not that "the insured should have foreseen *the consequences of the likelihood or strong possibility of death from* drinking and operating a motor vehicle while intoxicated."

Thus, Aetna's definition of "accident"—even though it incorporates some requirement of measuring "foreseeability" from the insured's viewpoint against an objective, reasonable person standard—fails to comport with the federal common-law definition of "accident" formulated in *Wickman* as applicable to the term under an ERISA plan that does not adequately or unambiguously define the term. As such, Aetna's definition is at odds with the substantive law of ERISA. *See Finley,* 957 F.2d at 621 (defining the third relevant factor for determination of the reasonableness of the administrator's plan interpretation as "whether [the plan administrator's] interpretation conflicts with the substantive or procedural requirements of the ERISA statute"). Aetna's definition

therefore fails the first factor of the *Finley* "reasonableness" determination considered here.

*vi. Consistency with New York common law.* The court finds that there are other indicia that Aetna's definition fails under the *Finley* factor considering consistency of Aetna's definition with the substantive requirements of ERISA. "Although federal common law is applicable to [ERISA] case[s], [courts] may look to state law for guidance, provided state law does not conflict with ERISA or its underlying policies." *McDaniel,* 195 F.3d at 1002 (citing *Mohamed v. Kerr,* 53 F.3d 911, 913 (8th Cir.1995)); *Mansker,* 54 F.3d at 1326 ("In fashioning federal common law under ERISA, including principles that govern the legal effect of plan terms, courts may look to state law for guidance so long as the state law is not contrary to the provisions of ERISA.") (citing *Brewer,* 921 F.2d at 153). Indeed, in formulating the *federal* common-law definition of "accident" in *Wickman,* the First Circuit Court of Appeals began with an examination of *state* law. *See Wickman,* 908 F.2d at 1085. Aetna's definition not only fails to comport with federal common law, as formulated in *Wickman,* it fails to comport with the state law appropriately examined for "guidance."

In a recent decision involving the identical question of whether the death of an intoxicated driver constituted an "accident" within the meaning of an ERISA plan, *Buce v. Allianz Life Insurance Company,* 247 F.3d 1133 (11th Cir.2001), the Eleventh Circuit Court of Appeals concluded that state law not only provided "guidance," but actually provided the definition of otherwise undefined or vaguely defined policy terms, even though the definition provided by state law was contrary to the one in *Wickman.* *See Buce,* 247 F.3d at 1146–47. The Eleventh Circuit Court of

Appeals explained its refusal to apply the *Wickman* standard as follows:

> In *Wickman,* as noted above, the term "accident", in an ERISA-governed group policy, was defined as an "unexpected, external, violent, and sudden event"—a definition the First Circuit charitably described as "somewhat less than dispositive." In circumstances of this sort—where the crucial terms of an accident policy are defined with surpassing vagueness, and the policy contains no general guidance as to the construction of those terms—we think that to deploy the federal common law of ERISA to give some unity to the concept of "accident" is sound judicial policy. Concretely, we think that, in the case before it, the First Circuit [Court of Appeals] was on eminently sound ground in ruling out "accidental means" and focusing instead on the objectively reasonable expectations of a person in the perilous situation that the decedent had placed himself in.

> *Wickman's* rejection of "accidental means" does not, however, rule the case of Walter Buce. In the case at bar, the vague terms of the policy—"bodily injury caused by an accident . . . and resulting directly and independently of all other causes in loss covered by the policy"—are given cognizable doctrinal context by another provision of the policy, the directive that "[t]he Plan is to be interpreted in accordance with the laws of the State of Georgia." Georgia—as this court held in *Laney [v. Continental Ins. Co.,* 757 F.2d 1190 (11th Cir. 1985) ]—is an "accidental means" jurisdiction.

*Buce,* 247 F.3d at 1146–47. Applying the state law giving vague terms "cognizable doctrinal context," the court held that the plan administrator's application of an "accidental means" test, which was consistent with Georgia law, to determine that the decedent's death was not an "accident"

under the policy "survives 'enhanced arbitrary and capricious' review." *Id.*

Plainly, the analysis in *Buce* is contrary to the law of this circuit, because it allows the state law chosen in a choice-of-law provision to override federal common law, not simply to provide "guidance" where the state-law rule is consistent with federal common law. *See McDaniel,* 195 F.3d at 1002; *Mansker,* 54 F.3d at 1326; *Brewer,* 921 F.2d at 153. Nevertheless, the court finds that the *result* of an analysis of the state law applicable to the UPS Plan by virtue of a choice-of-law provision is *consistent* with both *Buce* and the law of this circuit, but plainly *inconsistent* with Aetna's definition.

In this case, the UPS Plan includes a choice-of-law provision, which states, "This policy will be construed in line with the law of the jurisdiction in which it is delivered." UPS Plan at F205296B, Joint Appendix at 19. The UPS Plan further states that it is delivered in New York. *Id.* Therefore, under the express terms of the UPS Plan, the policy "will be construed in line with the law of" New York. As in *Buce,* the selection of New York law might "giv[e] cognizable doctrinal context" to the term "accident," where there is no other definition—not even a "vague" one—in the policy itself. *See Buce,* 247 F.3d at 1146–47. In this circuit, the question is not whether the definition provided by reference to the state law chosen in the contract is controlling, but whether that state-law definition is consistent with federal common law. *See McDaniel,* 195 F.3d at 1002; *Mansker,* 54 F.3d at 1326; *Brewer,* 921 F.2d at 153. The court finds that, in this case, the "cognizable doctrinal context" to the term "accident" provided by reference to New York law is also consistent with the federal common-law definition of the term under *Wickman.*

In *Miller v. Continental Ins. Co.*, 40 N.Y.2d 675, 389 N.Y.S.2d 565, 358 N.E.2d 258 (1976), a New York court, like the First Circuit Court of Appeals in *Wickman* formulating federal common law, rejected for purposes of New York common law what it described as the "accidental means" test. In *Miller*, the court confronted the question of whether the death of Douglas Miller from a drug overdose, where he was found dead by his parents with a needle in his wrist, was an "accident" within the meaning of a life insurance policy:

> The multifaceted term 'accident' is not given a narrow, technical definition by the law. It is construed, rather, in accordance with its understanding by the average man, who, of course, relates it to the factual context in which it is used.
>
> Taken literally, true 'accidents' may be rare occurrences. Most violent fatalities, where they do not result from intentional wrongdoing, are due to negligence, recklessness or poor judgment. Indeed, Mr. Justice Cardozo went so far as to suggest that "in the strictest sense and dealing with the region of physical nature there is no such thing as an accident" (*Landress v. Phoenix Ins. Co.*, 291 U.S. 491, 499, 54 S.Ct. 461, 463, 78 L.Ed. 934 citing *Brintons v. Turvey*, LR (1905) AC 230, 233).
>
> For instance, though one who drives a car while drunk metaphorically may be said to be 'committing suicide', it does not necessarily follow that his resulting death is to be regarded as 'intentional'. Instead, '(i)n construing whether or not a certain result is accidental, it is customary to look at the causality from the point of view of the insured, to see whether or not, from his point of view, it was unexpected, unusual and unforeseen'.
>
> Thus, in the case before us, while it may be inferred that the decedent's introduction of heroin into his body was intentional, there is no proof whatsoever that he intended it to have fatal consequences or even that he was aware of the fact that the particular dose of heroin which he was taking at the time posed any threat of death at all. In today's society, the knowledge has been forced upon us that heroin and other drugs are most often taken to induce a temporary aura of relaxation and well-being completely incompatible with any desire on the part of their users to depart life. When we add to that the fact that the brotherly admonition that 'it is bad for you' is likely to make as small an impression on drug users as do, for example, the regularly ignored official government warnings about the dire effects of cigarette smoking, can it be said that the trial court did not have the right to conclude that Douglas Miller, in injecting drugs into his bloodstream, did so without any thought of death in mind'? We think not.
>
> Perhaps a paraphrase of language to be found in *Beckham v. Travelers Ins. Co.*, 424 Pa. 107, 118–119, 225 A.2d 532, 537 (concurring opn), *Supra* is apt here:
>
>> 'Anyone who has read the classic Confessions of an English Opium Eater by Thomas De Quincy will understand that beguiling heaven toward which (Douglas Miller might have thought he was) directing his steps as he followed the inviting primrose path into the soothing dreams of nepenthe'.
>>
>> 'He (may have) used bad judgment, he (may have been) reckless (but everything points to the fact that), he did not want to bring bereavement and sadness to his mother'.
>
> Such an appreciation of the reality of things requires that the word 'accident' in the policy here be deemed to pertain not only to an unintentional or unexpected event which, if it occurs, will foresee-

ably bring on death, but equally to an intentional or expected event which unintentionally or unexpectedly has that result.

In contrast to cases in some other jurisdictions where there is no right to recover unless the means themselves are accidental, New York long ago rejected such an over-nice separation of accidental means from accidental death as one 'certainly not understood by the average man and he is the one for whom the policy is written'.

The spirit of that quotation also comports with the hornbook rule that policies of insurance, drawn as they ordinarily are by the insurer, are to be liberally construed in favor of the insured. That principle is kin to the proposition that "(i)f an exclusion of liability is intended which is not apparent from the language employed, it is the insurer's responsibility to make such intention clearly known".

It is the application of these principles which requires us to reject ... defendant's contention that the death here was not accidental as a matter of law....

*Miller v. Continental Ins. Co.*, 40 N.Y.2d 675, 389 N.Y.S.2d 565, 358 N.E.2d 258, 259–60 (1976) (most internal citations omitted). This decision plainly rejects the "accidental means" test as formulated, and then rejected in *Wickman*. Thus, in light of the New York common-law meaning of "accident," as articulated in *Miller*, Aetna's assertion of a definition of "accident" that excludes "an intentional or expected event," such as drinking and driving, "which unintentionally or unexpectedly" brings death is inconsistent with the law applicable to the UPS Plan under the choice-of-law provision. Because the New York definition of "accident" is *consistent* with federal common law, it provides further guidance on the proper interpretation of the term in the UPS Plan. *See McDan-*

*iel*, 195 F.3d at 1002; *Mansker*, 54 F.3d at 1326; *Brewer*, 921 F.2d at 153. For this reason, Aetna's rejection of the definition provided by the state law that would otherwise provide the "cognizable doctrinal context" to the term "accident," *see Buce*, 247 F.3d at 1146–47, is a further demonstration that Aetna's definition is at odds with the substantive requirements of ERISA, and consequently, is unreasonable, even under a deferential "arbitrary and capricious" review. *See Finley*, 957 F.2d at 621.

Not only does this *Finley* factor weigh heavily against the reasonableness of Aetna's interpretation of "accident," the court finds that other factors in the analysis also weigh against Aetna's interpretation.

### b. Consistency with goals of the Plan

The first of the five *Finley* factors is "whether [the plan administrator's] interpretation is consistent with the goals of the Plan." *Finley*, 957 F.2d at 621. Mrs. West contends that Aetna's interpretation of "accident" is *not* consistent with the goal of the Accidental Death and Dismemberment Coverage portion of the UPS Plan, because the goal of the Plan is to pay benefits for accidental death except in cases where an express exclusion applies. Therefore, she argues that "reading in" an "intoxication" exception would frustrate the goals of the UPS Plan. Mrs. West also contends that the definition chosen by Aetna allows Aetna to deny benefits arbitrarily, because it allows Aetna to deny benefits whenever Aetna can find that any conduct of the insured, from getting out of bed to crossing a street, increased the risks of death. In other words, she argues that an interpretation of "accident" that excludes any death that results from conduct of the decedent that is in some way "intentional" or increases the risk of death makes the UPS Plan's accidental death benefit a mirage, which must be contrary to the goal of

the Plan to provide benefits in appropriate circumstances.

Aetna argues that the goal of the UPS Plan is to pay death benefits only for *accidental* death, and that its interpretation is consistent with this goal, because it reasonably defines "accident." Aetna points out that the pertinent portion of the UPS Plan does not provide general life insurance coverage; indeed, Aetna points out that it paid general life insurance benefits to Mrs. West under the UPS Plan, even though it denied accidental death benefits.

The court finds, first, that Aetna's argument that its definition of "accident" is consistent with the goal of the UPS Plan, because it is "reasonable," is circular. The purpose of the *Finley* factors is to determine whether the definition is indeed "reasonable." *See, e.g., Finley,* 957 F.2d at 621 ("In determining whether the [plan administrator's] interpretation of [disputed terms] and decision to deny the [claimed] benefits are reasonable, [courts] consider" identified factors). Therefore, it is unilluminating to argue that the interpretation of a plan term satisfies any of the *Finley* factors, and so is reasonable, because it is reasonable.

Instead, whether an interpretation of a key term is consistent with the goal of the plan would seem to hinge on the goal identifiable from the language of the plan itself. *See, e.g., Finley,* 957 F.2d at 621 (determining by looking at the terms of the plan that the "primary goal" of the plan at issue was "to provide an employees' benefit and welfare plan for members (active and retired) of various federal law enforcement agencies" and that the Plan provided "basic accidental death and dismemberment benefits for loss of life or specified dismemberments which occur 'through accidental means on or off the job' "). The pertinent portion of the UPS Plan states, "This Plan pays a benefit if, while insured, you suffer a bodily injury in an accident and if, within 90 days after the accident, you lose, as a direct result of the injury ... [y]our life." UPS Plan at 5, Joint Appendix at 10. Moreover, the UPS Plan reiterates, in the "Limitations" provision, that "[b]enefits are paid for losses caused by accidents only," and then explains that "[n]o benefits are payable for a loss caused or contributed to by" six specific agencies: "[b]odily or mental infirmity," "[d]isease, ptomaines or bacterial infections," "[m]edical or surgical treatment," "[s]uicide or attempted suicide," "[i]ntentionally self-inflicted injury," and "[w]ar or any act of war (declared or undeclared)." *Id.* There is no "including but not limited to" language preceding the list of specific exceptions. Thus, as a matter of plain meaning, the goal of the UPS Plan is to pay benefits "for losses caused by accidents" except where expressly excluded. There is no "intoxication" exception to coverage under the Plan. However, by the same token, the UPS Plan expressly states that "[b]enefits are paid for losses caused by accidents *only.*" *Id.* (emphasis added). Thus, the goal of the UPS Plan—to pay benefits for deaths caused by accidents—turns on the meaning of precisely the term in dispute here, "accident."

Perhaps a more illuminating approach is to recognize that, particularly where a key term is otherwise undefined, the goal of the plan must be to pay benefits in accordance with the terms of the plan *as defined by applicable law. See Buce,* 247 F.3d at 1147 ("In the case at bar, the vague terms of the policy—'bodily injury caused by an accident ... and resulting directly and independently of all other causes in loss covered by the policy'—are given cognizable doctrinal context by another provision of the policy, the directive that '[t]he Plan is to be interpreted in accordance with the laws of the State of

Georgia.'") As explained above, Aetna's definition of "accident" is inconsistent with *both* the federal common-law definition, as formulated in *Wickman*, which is applicable by virtue of ERISA, and New York law, which would otherwise be applicable by virtue of the choice-of-law provision, and the definition supplied by New York law is consistent with the definition supplied by federal common law. *See McDaniel*, 195 F.3d at 1002; *Mansker*, 54 F.3d at 1326; *Brewer*, 921 F.2d at 153. Also, where the plan administrator's definition of a key term is at odds with the definition of an otherwise undefined term provided by the law applicable to the plan, there is some merit to Mrs. West's argument that coverage that is dependent on the meaning of the key term is only a "mirage," because the coverage resulting from the plan administrator's definition is not the coverage that could reasonably be expected under the governing law, and hence is contrary to the goals of the plan. Thus, this factor also weighs against the reasonableness of Aetna's interpretation of "accident" within the meaning of the UPS Plan.

### c. Internal inconsistencies

The second factor in the *Finley* analysis is "whether [the plan administrator's] interpretation renders any language in the Plan meaningless or internally inconsistent." *Finley*, 957 F.2d at 621. Mrs. West argues, first, that Aetna's definition of "accident" is inconsistent with the provision of the UPS Plan stating that the policy will be construed in line with New York law, because Aetna's definition adopts the "accidental means" test expressly rejected by New York courts. She also contends that Aetna's definition renders meaningless or is inconsistent with the express exclusions in the policy of coverage for death caused by suicide, attempted suicide, or intentionally self-inflicted injury. Such specific exclusions, she argues, are rendered unnecessary and meaningless if the definition of "accident" excludes any foreseeable risk or death that is a consequence of any intentional act. She also argues that Aetna's definition makes the entire plan inconsistent, because it promises payment for "accidents," but then allows Aetna to deny payment if the insured's conduct increases the risk of injury or death in some fashion. In short, she argues that the policy promises nothing if Aetna's definition of "accident" is allowed to stand.

Aetna argues that its definition of "accident" is in fact consistent with the nature of the accidental death portion of the UPS Plan and the specific exclusions stated therein. Aetna also argues that the express exclusions are illustrative, rather than exhaustive. Aetna argues further that the choice-of-law provision of the Plan does not bind it to all interpretations under New York common law, or Aetna would not have the discretion expressly stated by the contract to interpret disputed terms. At oral arguments, Aetna's counsel argued that the "discretion" and "choice-of-law" provisions can be reconciled, because New York law applies rules of contract interpretation only when terms are unclear, as opposed to the discretion granted Aetna to determine the meaning of "disputed" terms. Counsel also argued that New York law would apply to construction of the *policy*, including whether or not the policy was valid, but not necessarily to determination of the meaning of individual terms.

In reply, Mrs. West argues that the choice-of-law provision has no meaning if Aetna can ignore the definition of terms imposed by the chosen law as a matter of "discretion." Therefore, she argues, the "discretion" and choice-of-law provisions render the UPS Plan internally inconsistent if Aetna has the discretion to define

"accident" in a manner contrary to the definition that would follow from the law applicable under the choice-of-law provision.

*i. Inconsistency with the choice-of-law provision.* As explained above, the UPS Plan does include a choice-of-law provision requiring the policy to be "construed in line with the law of the jurisdiction in which it is delivered," in this case, New York. UPS Plan at F205296B, Joint Appendix at 19. As was also explained above, Mrs. West is also correct that New York law rejects the "accidental means" test embodied in Aetna's definition of "accident." Thus, the definition provided by the choice-of-law provision is consistent with the definition provided by federal common law, as embodied in Wickman, and inconsistent with Aetna's interpretation.

Aetna argues that the choice-of-law provision conflicts with the "discretion" provision—which provides Aetna with the "discretionary authority to ... construe any disputed or doubtful terms of this policy," UPS Plan at 9190, Joint Appendix at 37—because the choice-of-law provision imposes on Aetna a definition from New York law overriding Aetna's discretion. However, Aetna's counsel argued that the "discretion" and "choice-of-law" provisions can be reconciled, if the UPS Plan is read to apply New York law regarding rules of contract interpretation only when terms are unclear, while Aetna has the discretion to determine the meaning of "disputed" terms. The court is unpersuaded by Aetna's argument, and indeed concludes that if there is any conflict, a different reconciliation of the two provisions is appropriate. The "choice-of-law" provision states, "This policy will be construed in line with the law of the jurisdiction in which it is delivered," which in this case is New York. The court cannot read this broad language to be restricted, as Aetna suggests, to matters of policy validity. Rather, plainly encompassed within "construction" of a policy "in line with the law of the [selected] jurisdiction" is construction and interpretation of its individual terms. Moreover, the court concludes that, if New York law applied, "accident" would not be a "disputed or doubtful term" within the scope of Aetna's discretion, because New York law would provide the applicable definition, *see Buce,* 247 F.3d at 1147 (a choice-of-law provision provides a "cognizable doctrinal context" for vague or undefined terms), and indeed, a definition contrary to the one Aetna asserts, *see Miller v. Continental Ins. Co.,* 40 N.Y.2d 675, 389 N.Y.S.2d 565, 358 N.E.2d 258, 259–60 (1976) (quoted *supra* ), leaving nothing for Aetna to construe in its discretion pursuant to the "discretion" provision. To put it another way, Aetna cannot invoke the "discretion" clause to override a definition provided by the choice-of-law provision, where the law applicable by virtue of the choice-of-law provision provides a definition that is consistent with federal common law. *See McDaniel,* 195 F.3d at 1002; *Mansker,* 54 F.3d at 1326; *Brewer,* 921 F.2d at 153.

Thus, the inconsistency of Aetna's definition of "accident" with the definition that would be provided by virtue of the choice-of-law provision also weighs against the reasonableness of Aetna's interpretation, because Aetna's definition "renders [the choice-of-law provision] in the Plan meaningless or internally inconsistent," by substituting Aetna's definition for the definition applicable via the choice-of-law provision. *Finley,* 957 F.2d at 621.

*ii. Inconsistency with express limitations.* Mrs. West also contends that Aetna's definition renders meaningless or is inconsistent with the express exclusions in the policy of coverage for death caused by suicide, attempted suicide, or intentionally self-inflicted injury. Although the court

agrees with Aetna that its definition of "accident" is consistent with these express exclusions, that definition of "accident" also plainly renders these express exclusions meaningless or redundant. Suicide, attempted suicide, and intentionally self-inflicted injury are not "event[s] which happe[n] by chance, or fortuitously, without intention or design, and which [are] unexpected, unusual and unforeseen"; rather, each is an "intentional act [that] exposed [the decedent] to unnecessary risks which were reasonably foreseeable"—indeed, intended—"and such that he should have known or appreciated the consequences of his intentional acts, [which are specifically] the likelihood or strong possibility of death." *See, e.g.*, June 15, 1998, Denial Letter at 2 (defining "accident" for purposes of the UPS Plan), Joint Appendix at 48. Thus, if Aetna's definition of "accident" obtains, there would seem to be no need to define these express exclusions to eliminate from coverage what otherwise might fall within the meaning of "accident."

Mrs. West argues that Aetna could have included an express "intoxication" exclusion, and that its failure to do so should be construed against it as the drafter of the UPS Plan. The extent to which this court can rely on the *contra proferentem* rule in an ERISA case is not altogether clear under the law of this circuit. In *Prudential Ins. Co. of Am. v. Doe*, 140 F.3d 785 (8th Cir.1998), the court read *Brewer v. Lincoln Nat'l Life Ins. Co.*, 921 F.2d 150 (8th Cir.1990), *cert. denied*, 501 U.S. 1238, 111 S.Ct. 2872, 115 L.Ed.2d 1038 (1991), to "hold 'that [the *contra preferentem* ] rule of construction violates the provisions of ERISA and thus cannot be used to interpret the plan's terms.'" *See Prudential Ins. Co. of Am.*, 140 F.3d at 791 (quoting *Brewer*, 921 F.2d at 152). However, subsequent to *Brewer*, the Eighth Circuit Court of Appeals appeared to limit its holding in this regard, as follows:

After applying ordinary principles of interpretation to the plan at issue, *see DeGeare v. Alpha Portland Indus.*, 837 F.2d 812, 816 (8th Cir.1988), the district court found the language of the plan ambiguous. When extrinsic evidence failed to resolve the ambiguities in the language, the court construed the language of the plan against Durham. In *Brewer v. Lincoln Nat'l Life Ins. Co.*, 921 F.2d 150, 153 (8th Cir.1990), we held that the Missouri rule of construction that requires ambiguities to be construed in favor of the insured could not be used in interpreting the terms of a plan governed by ERISA. There, we were able to resolve the ambiguity in the language by interpreting the language as would "an average plan participant." *See id.* at 154 (quoting 29 U.S.C. § 1022(a)(1) (1988)). The language at issue in Brewer ceased to be ambiguous when it was accorded its ordinary, and not specialized, meaning. *Brewer*, 921 F.2d at 154.

Here, however, as the district court aptly demonstrated, the language remains ambiguous even after applying the approach in *Brewer*. Therefore, the district court correctly used the principle of *contra proferentem* and construed the ambiguous language against Durham. *As a matter of federal common law, a court construing plans governed by ERISA should construe ambiguities against the drafter only if, after applying ordinary principles of construction, giving language its ordinary meaning and admitting extrinsic evidence, ambiguities remain.* See *DeGeare*, 837 F.2d at 816 (stating that "[c]onstruing ambiguities against the drafter should be the last step of interpretation, not the first step"); *see also Taylor v. Continental Group Change In Control Severance Pay Plan*, 933 F.2d 1227, 1233 (3rd Cir. 1991).

*Delk v. Durham Life Ins. Co.*, 959 F.2d 104, 105–06 (8th Cir.1992) (emphasis added); *see also Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1452 & n. 2 (5th Cir.1995) (op. by White, Assoc. Justice, retired) (noting the tension between *Brewer* and *Delk*, but concluding, on the basis of *Delk*, that the Eighth Circuit Court of Appeals recognizes the *contra proferentem* rule in ERISA cases). The court believes that the meaning of "accident" under the UPS Plan also ceases to be ambiguous, even though it is undefined in the Plan, when the court applies either federal common law—as embodied in *Wickman*—or a consistent interpretation from New York law, applicable by virtue of the choice-of-law provision, which is consistent with the federal common law in this regard. *Cf. Delk*, 959 F.2d at 105–06 (considering the applicability of the *contra proferentem* rule to hinge on whether the term remains ambiguous after application of rules of interpretation). However, the court agrees with the observation of retired Associated Justice White that "life insurance companies have ample ways to avoid judgments like this one," *see Todd*, 47 F.3d at 1457, including insertion of an express "intoxication" exclusion into an accidental death policy.

Thus, the court also concludes that Aetna's interpretation is inconsistent with the express exclusions in the UPS Plan.

### d. *Inconsistent interpretation by the administrator*

For the sake of completeness, the court recognizes that the fourth *Finley* factor is "whether [the plan administrator] ha[s] interpreted the words at issue consistently." *Finley*, 957 F.2d at 621. However, the parties agree that there is no evidence in the record here as to how Aetna has interpreted "accident" in other ERISA-governed accidental death plans it administers. Therefore, this factor has no weight in the present analysis.

### e. *Inconsistency with clear language of the Plan*

The last of the *Finley* factors, as listed in that decision and as considered in this decision in reference to the reasonableness of Aetna's interpretation of "accident" within the meaning of the UPS Plan, is "whether [the plan administrator's] interpretation is contrary to the clear language of the Plan." *Finley*, 957 F.2d at 621. Mrs. West argues that, because Aetna's interpretation is contrary to the interpretation clearly called for by New York law, which is applicable to the Plan by virtue of the choice-of-law provision, this factor also weighs against the reasonableness of Aetna's interpretation.

The court agrees with Mrs. West that, under the decision in *Lickteig v. Business Men's Assurance Company of America*, 61 F.3d 579 (8th Cir.1995), "significant weight should be given to [a plan administrator's] misinterpretation of unambiguous language of a plan." *See Lickteig*, 61 F.3d at 585. On the one hand, the court noted above that there does not appear to be any "ordinary" meaning of "accident," at least in the context of accidental death insurance or benefit plans, which suggests that Aetna's definition is not necessarily contrary to any "clear" meaning of "accident." However, looking at the "clear language of the Plan," *see Finley*, 957 F.2d at 621, from a slightly broader perspective, the UPS Plan clearly called for application of New York law to otherwise undefined terms. *See* UPS Plan at F205296B, Joint Appendix at 19. In this case, the definition clearly called for by application of New York law is contrary to Aetna's, and in this case, no inconsistency between the state law applicable by virtue of the choice-of-law provision and federal common law would permit Aetna to disregard the meaning dictated by the choice-of-law provision. *See McDaniel*, 195 F.3d at 1002;

*Mansker,* 54 F.3d at 1326; *Brewer,* 921 F.2d at 153. In such circumstances, Aetna's assertion of a definition contrary to the one required by state law applicable by virtue of an unambiguous choice-of-law provision does indeed weigh against the reasonableness of Aetna's definition. *Cf. Lickteig,* 61 F.3d at 585.

### 3. Summary

The court finds that all four of the *Finley* factors that are shown to be relevant in this case weigh *against* the reasonableness of Aetna's interpretation of "accident." Thus, even under the most deferential standard of review, Aetna's definition is "unreasonable," and hence, "arbitrary and capricious." *See Davolt,* 206 F.3d at 809 (concluding that the court need not resolve the question of the degree of deference or applicability of *de novo* review, "because any standard of review (even one determined on an intermediate 'sliding scale,' *see Woo,* 144 F.3d at 1161–62) will yield the same result").

### C. Application Of The "Substantial Evidence" Test

The court concluded above that, although the parties had focused on the application of the *Finley* five-factor test to the reasonableness of Aetna's interpretation of the UPS Plan, the parties' arguments over the reasonableness of Aetna's decision also involve the reasonableness of Aetna's evaluation of the facts to determine the application of the Plan. Therefore, assuming for the sake of argument that Aetna's *definition* of "accident" is reasonable—*i.e.,* consistent with *Wickman,* as Aetna argues—the court turns to the question of whether Aetna's decision to deny benefits, on the ground that Mr. West's death did not fit its definition of "accident," "is supported by substantial evidence." *Farley,* 147 F.3d at 777. Just as *Wickman* provides the formulation of the federal common-law standard of what con-

stitutes an "accident" within the meaning of an ERISA-governed plan that does not otherwise unambiguously define the term, *Wickman* provides an explanation of evaluation of the facts to determine the applicability of an ERISA plan in light of this definition. Therefore, the court's analysis of this phase of its "reasonableness" analysis also begins with the *Wickman* decision.

### 1. Wickman's evaluation of the facts

In *Wickman,* the evaluation of the facts by the First Circuit Court of Appeals was much more compact than its promulgation of the federal common-law definition of "accident":

> Applying these concepts, we believe that the magistrate did not err in ruling that Wickman's death was not an accident within the terms of the insurance policy. The linchpin of the magistrate's findings was his conclusion that "Wickman knew or should have known that serious bodily injury or death was a probable consequence substantially likely to occur as a result of his volitional act in placing himself on the outside of the guardrail and hanging on with one hand." *This finding equates with a determination either that Wickman expected the result, or that a reasonable person in his shoes would have expected the result, and that any other expectation would be unreasonable.*

> If he actually expected the result, even if he did not specifically intend it, then his actual expectations make his death not accidental. It appears that the magistrate hedged his opinion with the "should have known" language because the third scenario, that Wickman went out on the rail for reasons other than to injure or kill himself, was undeveloped and unsubstantiated at trial. The plaintiff never proffered a specific alternate explanation for Wickman's ac-

tions, leaving the magistrate to conjecture. *Under such circumstances, it certainly can be said that there was insufficient evidence, assuming arguendo, as did the magistrate, the accuracy of the third scenario, to reach a conclusion as to Wickman's actual expectation. Thus, the magistrate appropriately engaged in an objective analysis.*

The magistrate's conclusion that Wickman "should have known" that death or injury was "substantially likely to occur" is not in error either legally or factually. Legally, "should have known" is synonymous with, if not even a higher standard than, the reasonable expectation standard we promulgated above. Similarly, "substantially likely to occur" is an equivalent, if not tougher, standard to "highly likely to occur." Thus, the magistrate applied an acceptable legal standard, and did not commit an error of law.

The plaintiff has never seriously challenged the accuracy of the factual conclusion. *She largely concedes that a reasonable person in Wickman's shoes would have expected to die or be seriously injured as a result of climbing over the guardrail and hanging on with only one hand. Such a concession, given the height of the bridge, the narrow foothold, that Wickman possessed no extraordinary gymnastic, acrobatic, or other athletic skills, and the absence of evidence that would have enabled him to hold on, is not surprising. Thus, the magistrate's conclusion that Wickman's death was to be reasonably expected is not clearly erroneous.*

*Wickman,* 908 F.2d at 1088–89 (footnotes omitted; emphasis added). Thus, in *Wickman,* the court actually applied both prongs of the test of what is an "accident," both the subjective and the objective, and concluded that, as to the first prong, that there was insufficient evidence of actual expectation, and, as to the second prong,

that the plaintiff had *conceded* that it was objectively unreasonable not to foresee that injury or death was highly likely to occur in the circumstances in which the decedent had placed himself. Here, however, Mrs. West makes no such concession. Therefore, more examination of the evidence before Aetna at the time it denied Mrs. West's claim is required. *See Farley,* 147 F.3d at 777 (when determining whether the administrator's determination is supported by "substantial evidence," courts "consider only the evidence that was before the administrator when the claim was denied").

### 2. Intoxicated driver cases applying *Wickman*

Aetna contends that, not only was the result in *Wickman* a reasonable evaluation of the facts to determine the applicability of the plan, nearly every federal decision applying *Wickman* to determination of whether an intoxicated driver's death was an "accident" within the meaning of an ERISA plan has concluded that such a driver's death was *not* an accident. The court cannot disagree that this is what the vast majority of the courts relying specifically on the *Wickman* definition of "accident" have held in intoxicated driver cases. *See Cozzie v. Metropolitan Life Ins. Co.,* 140 F.3d 1104, 1110–11 (7th Cir.1998) ("We do not suggest that MetLife could sustain a determination that all deaths that are causally related to the ingestion of alcohol, even in violation of law, could reasonably be construed as not accidental. . . . However, given the amount of alcohol ingested here [producing a blood alcohol content of .252%] and the exclusion of any other cause for the accident, we cannot say that it was arbitrary and capricious for MetLife to determine that this particular vehicular death was no 'accident.' "); *Mullaney v. Aetna U.S. Healthcare,* 103 F.Supp.2d 486, 493–94 (D.R.I.2000) ("Applying the rule of

*Wickman* this Court holds that Mr. Mullaney's death cannot be deemed an accident. Mr. Mullaney was driving at night at an excessive rate of speed, conditions that alone would have rendered his actions unsafe. In addition, Mr. Mullaney, on the evening in question, had consumed enough alcohol to give him a blood alcohol level of nearly four times the legal limit. At this level of intoxication, Mr. Mullaney had little control over his physical or mental faculties, and so little control of his vehicle that he did not even attempt to apply the brakes. Even if it be assumed that Mr. Mullaney himself may not have intended or foreseen any harm in attempting to drive while grossly intoxicated, a reasonable person surely would have known that such conduct would likely result in serious bodily harm or death. Mr. Mullaney's actions clearly fail the *Wickman* test, and his death cannot be considered 'accidental.' "); *Walker v. Metropolitan Life Ins. Co.*, 24 F.Supp.2d 775, 780–82 (E.D.Mich.1997) ("The hazards of driving while intoxicated are well-known. The public is reminded daily of the risks of driving while intoxicated both in warnings from the media and in motor vehicle and criminal laws. A reasonable person with the decedent's background and experience would have known that injury was highly likely to occur as a result of decedent's intentional conduct in driving while intoxicated."); *Cates v. Metropolitan Life Ins. Co., Inc.*, 14 F.Supp.2d 1024, 1027 (E.D.Tenn.1996) ("Given these prior interpretations of similar ERISA provisions [in cited cases], the Court cannot say Metropolitan's denial of Cates' accidental death benefits claim was arbitrary and capricious. It is neither unreasonable nor irrational in light of the Plan's provisions for Metropolitan to conclude 'the act of driving while [intoxicated at BAC 00.18] rendered the infliction of serous (*sic.*) injury or death reasonably foreseeable and, hence, not accidental as contemplated by the [P]lan.' "), *aff'd*, 149 F.3d 1182 (6th Cir.1998) (table op.); *Schultz v. Metropolitan Life Ins. Co.*, 994 F.Supp. 1419, 1422 (M.D.Fla.1997) ("The horrors associated with drinking and driving are highly publicized and well known to the public. 'It is clearly foreseeable that driving while intoxicated may result in death or bodily harm.' *Fowler*, 938 F.Supp. at 480 [*infra*]. Mr. Rector knew, or should have known, that he was risking his life in a real and measurable way by driving while intoxicated. Any other expectation would have been unreasonable. Consequently, Defendant did not act arbitrarily and capriciously in denying Benefits under the Plan to Plaintiff."); *Nelson v. Sun Life Assur. Co. of Canada*, 962 F.Supp. 1010, 1012 (W.D.Mich.1997) ("The *Wickman* test favors Defendant in the case at bar. All drivers know, or should know, the dire consequences of drunk driving. Thus, the fatal result that occurred in this case should surprise no reasonable person.") & 1013 (adding, in relation to arguments concerning the applicability of a "self-inflicted injuries" exclusion, "[t]here can be no dispute that the voluntary consumption of alcohol, in conjunction with the high blood content, would seriously impair Hardwick's judgment and ability to control his vehicle"); *Miller v. Auto–Alliance Int'l, Inc.*, 953 F.Supp. 172, 176–77 (E.D.Mich. 1997) ("In the instant case, MetLife contends that given common knowledge and the current opprobrium in the media and legal system for driving while intoxicated, the decedent should have reasonably foreseen that death or serious injury may result from his actions. . . . This court finds that no reasonable trier of fact could find that MetLife's determination to deny benefits under the AD & D policy was unreasonable."); *Fowler v. Metropolitan Life Ins. Co.*, 938 F.Supp. 476, 480 (W.D.Tenn.1996) ("As pointed out by Met Life, the hazards of drinking and driving are widely known and widely publicized.

It is clearly foreseeable that driving while intoxicated may result in death or bodily harm. As the decedent should have foreseen the consequences of driving while intoxicated, Met Life's determination that his death was not accidental was reasonable.").[7]

Federal decisions, however, are not completely without glimmers of the possibility of a different conclusion. In *Metropolitan Life Ins. Co. v. Potter*, 992 F.Supp. 717 (D.N.J.1998), the court not only distinguished much of the precedent noted just above, but found that there were genuine issues of material fact on both prongs of the *Wickman* test of what constitutes an "accident" in the case of the death of an intoxicated driver. After taking note of the decisions in *Nelson, Miller,* and *Fowler,* cited just above, and the district court decision in *Cozzie v. Metropolitan Life Ins. Co.,* 963 F.Supp. 647 (N.D.Ill.1997), affirmed in the decision cited just above, the court observed, "While some of these authorities cited *Wickman,* none of them actually employed the two-pronged test." *Potter,* 992 F.Supp. at 729. The court continued its analysis as follows:

> The Court finds that the two-pronged standard articulated in *Wickman* and followed (and perhaps expanded) in [*Todd v. AIG Life Ins. Co.,* 47 F.3d 1448 (5th Cir.1995) (op. by White, Assoc. Justice, retired),] provides a workable framework for determining whether death under an accidental death policy may be deemed an accident. Plaintiff agrees that these authorities articulate

the appropriate standard and, in fact, cited *Wickman* as a governing legal authority in its denial letter to defendant. See Potter Aff., Ex. H, at 3. However, despite its asserted reliance on *Wickman,* plaintiff's denial letter stated that the decedent's death was "foreseeable" and "expected" and that decedent's driving while intoxicated "significantly elevat[ed] the risk that harm will occur." Potter Aff., Ex. H, at 2. *Wickman requires more than mere foreseeability or increased risk.* For death to be deemed accidental under Wickman, it must first be determined that the decedent had an actual expectation of survival. *Wickman,* 908 F.2d at 1088. If it is determined that the insured expected to survive, or where there is insufficient evidence of the insured's actual expectations, *then it must be determined whether an expectation of survival is objectively reasonable, which it is if death is not "highly likely to occur as a result of the insured's intentional conduct." Id.* A death will be deemed non-accidental under Wickman only where the decedent expected to die, or where a reasonable person in the decedent's shoes would have viewed death as "highly likely to occur" and that "any other expectation would be unreasonable." *Id.*

Here, there is insufficient evidence to make a determination under either prong of the Wickman analysis. The parties have not presented any evidence as to the decedent's subjective expecta-

---

**7.** The decision in *Fowler* continues, "It was also reasonable to find that his death was, at least partially, intentionally self-inflicted. Furthermore, as the decedent's blood alcohol content was .26 percent, which would seriously impair his judgment and ability to control his vehicle, it was not unreasonable to conclude that his death was the result of bodily and mental infirmity. Therefore, the court finds that Met Life's denial of accidental

death benefits was not arbitrary and capricious." *Fowler,* 938 F.Supp. at 480. In this case, however, Aetna has eschewed reliance on any of the express exclusions in the policy. Thus, only the portion of the *Fowler* decision quoted in the body of this decision is pertinent to the purported factual grounds upon which Aetna determined that Mr. West's death was not an "accident" within the meaning of the UPS Plan.

tions when the policy was purchased. *Nor has plaintiff submitted any evidence that it determined, or that an objectively reasonable person would determine, that the decedent expected to die or that death was "highly likely" to occur as a result of her drunk driving and that "any other expectation would be unreasonable."* At best, plaintiff's submissions establish the undisputed proposition that alcohol consumption impairs motor functions and faculties and increases the risk of driving collisions. *The Court declines to find that plaintiff was not arbitrary and/or capricious, as a matter of law, when, in its denial letter, it purported to apply "the law," cited Wickman, and then misapplied it by ignoring its requirement that death be "highly likely" to negate a finding of accidental death. The Court cannot find as a matter of law that death is "highly likely to occur" as a result of drunk driving and that "any other expectation would be unreasonable" where many drunken drivers survive (to be prosecuted or perhaps to repeat their risky conduct).*

*Potter,* 992 F.Supp. at 729–30 (emphasis added; footnote omitted). The court therefore denied the parties' cross-motions for summary judgment. *Id.* at 730–31.

### 3. Misapplications of Wickman

■ The court not only agrees with the court in *Potter* that the decisions in *Cozzie, Nelson, Miller,* and *Fowler,* misapplied the second prong of the *Wickman* test for what is an "accident," but so did each of the other courts to rule subsequently that the death of an intoxicated driver was not an "accident" within the meaning of an ERISA plan. Some of these decisions apply a standard involving a far lower standard of probability, amounting merely to the "possibility" of injury or death, than the *Wickman* test requires. *See Miller,* 953 F.Supp. at 176–77 (relying on a *"may*

result" standard, not *Wickman's* "highly likely" or "substantially likely" standard) (emphasis added); *Fowler,* 938 F.Supp. at 480 (stating, "It is clearly foreseeable that driving while intoxicated *may* result in death or bodily harm," when the proper standard is that injury or death is "highly likely" to result) (emphasis added). In other decisions, the court apparently assumed that intoxication establishes that death or injury is "highly likely to occur," in the complete absence of any evidence establishing actual probability. As substitutes for actual proof that a drunk driver is so likely to be injured or killed that any other expectation is unreasonable, these decisions sometimes rely on "common knowledge," "the media," drunk driving laws, or the logical, but unproved, assumption that a higher blood alcohol content necessarily increases the probability of injury or death while driving to the point that death or injury is "highly likely," not just *more* likely, to result. *See, e.g., Cozzie,* 140 F.3d at 1110–11 (relying on a BAC of .252% and the exclusion of other causes of the accident, without reference to any evidence that such a BAC necessarily makes injury or death "highly likely," not merely an increased possibility); *Mullaney,* 103 F.Supp.2d at 493–94 (relying on the fact that the decedent was driving at an excessive speed and had a BAC at nearly four times the legal limit as establishing that the decedent had "so little control of his vehicle that he did not even attempt to apply the brakes," and assuming reasonable foreseeability that serious bodily harm or death would likely result, without evidence that persons with such a BAC are indeed more likely to be injured or die than to avoid such consequences); *Walker,* 24 F.Supp.2d at 780–82 (assuming that "warnings from the media and in motor vehicle and criminal laws" establish that it is reasonably foreseeable that injury was highly likely to occur, in the ab-

sence of any evidence that injury or death is actually highly likely, or even more likely, to occur); *Cates,* 14 F.Supp.2d at 1027 (relying on prior decisions, not evidence, as establishing that "infliction of ser[i]ous injury or death" was "reasonably foreseeable," and failing to consider whether injury or death was "highly likely"); *Schultz,* 994 F.Supp. at 1422 (relying on the fact that "[t]he horrors associated with drinking and driving are highly publicized and well known," and the misstatement in *Fowler* of the probability standard, without any evidence of actual probability); *Nelson,* 962 F.Supp. at 1012 (because "[a]ll drivers know, or should know, the dire consequences of drunk driving," the death of the decedent was "no surprise," when the standard is that death or injury is "highly likely," and no evidence was identified establishing such a likelihood); *Miller,* 953 F.Supp. at 176–77 (in addition to relying on a "may result" standard, relying on "common knowledge and the current opprobrium in the media and legal system" as substitutes for actual evidence of probability of injury or death). Thus, decisive and consistent as these decisions are, this court does not find them persuasive.

#### 4. *Aetna's evaluation of the facts*

In this case, the court finds that Aetna's evaluation of the facts is also flawed, such that there is barely a "scintilla" of evidence, and certainly not "substantial evidence," establishing that Aetna made a reasonable evaluation of the facts to determine whether the UPS Plan was applicable, *see Woo,* 144 F.3d at 1162 ("Substantial evidence" is " 'more than a scintilla but less than a preponderance' ") (quoting *Donaho,* 74 F.3d at 900 n. 10), even assuming that Aetna applied a definition of "accident" that could be upheld as consistent with *Wickman.* This is not to suggest that there is no evidence that intoxication was a contributing factor to Mr. West's fatal crash, or that Aetna did not properly rule out weather or road conditions as contributing to the crash. Nor is there any dispute that Mr. West was operating a motor vehicle with a BAC of .203 (203 mg/dL), twice the legal limit in Iowa of .10. Iowa Code § 321J.2(1)(b) ("A person commits the offense of operating while intoxicated if the person operates a motor vehicle in this state ... [w]hile having an alcohol concentration as defined in section 321J.1 of .10 or more."); Iowa Code § 321J.1(1)(a) ("As used in this chapter unless the context otherwise requires ... '[a]lcohol concentration' means the number of grams of alcohol per ... [o]ne hundred milliliters of blood.").

Even assuming that Aetna made a finding that Mr. West should have known or appreciated that the consequences of his driving while intoxicated were the "lik[e]lihood or strong possibility of death," rather than simply a finding that Mr. West should have known or appreciated that his driving while intoxicated would have some "consequences," *see* June 15, 1998, Denial Letter at 2, Joint Appendix at 48, *and interpretation of Denial Letter supra,* Aetna has not identified any evidence that was then before it from which such a finding could be made. *See Farley,* 147 F.3d at 777 (in determining whether there is "substantial evidence," courts "consider only the evidence that was before the administrator when the claim was denied").

For one thing, Aetna's articulation of the effects of intoxication apparently involves either typographical errors or a misunderstanding of the source upon which Aetna relied and the evidence before it. Although Aetna correctly identifies Mr. West's BAC as 203 mg/dL, it incorrectly identifies the "Iowa State legal limit" as "10mg/dL," *see* June 15, 1998, Denial Letter at 2, Joint Appendix at 48, when the "legal limit" in Iowa is actually 100 mg/dL. *See* Iowa Code § 321J.2(1)(b) ("A person

commits the offense of operating while intoxicated if the person operates a motor vehicle in this state ... [w]hile having an alcohol concentration as defined in section 321J.1 of .10 or more."); IOWA CODE § 321J.1(1)(a) ("As used in this chapter unless the context otherwise requires ... '[a]lcohol concentration' means the number of grams of alcohol per ... [o]ne hundred milliliters of blood.").

Next, Aetna's evaluation of the facts was premised on the following:

> According to "Forensic Pathology" written by Dominick and Vincent DiMaio (1989), the signs and symptoms of an individual with Acute Alcohol Intoxication with a blood alcohol level of 20–30mg/dL [sic] are as follows: "Staggering, grossly impaired in motor activities, reaction times, attention, visual acuity and judgment; drunk. Progressive increase in disorientation, emotional lability. Loss of cordination [sic], slurred speech. May be lethargic and sleepy or hostile and aggressive".

*Id.* Although the court has been unable to obtain a copy of "Forensic Pathology," it is readily apparent that Aetna's reference to that authority contains at least a typographical error, and possibly indicates that Aetna was operating under a significant misunderstanding of pertinent information. This is so, because Aetna's Denial Letter suggests that a person is "[s]taggering, grossly impaired in motor activities, reaction times, attention, visual acuity and judgment" and "drunk" with a BAC of .02–.03, when the legal limit in Iowa is a BAC of .10, *see* IOWA CODE § 321J.2(1)(b) ("A person commits the offense of operating while intoxicated if the person operates a motor vehicle in this state ... [w]hile having an alcohol concentration as defined in section 321J.1 of .10 or more."), and other authority indicates that the "feel" of the effects of intoxication only begins at approximately 40 mg/dl, or a BAC of .04, a

BAC significantly higher than Aetna indicated would produce "staggering." *See* Glenn E. Rohrer, Brian A. McMillen & Joyce G. Reed, *Calculation of Blood Alcohol Concentration in Criminal Defendants,* 22 AM.J. TRIAL ADVOC. 177, 189 Fig. 1 (Summer 1998) (indicating that).

While Aetna's finding that "there [c]ould have been some degree of impairment with a blood alcohol level of 203mg/dL" is undisputable in light of the legal limit of 100 mg/dL for driving in Iowa, this evidence of impairment is far from evidence upon which to base a conclusion that injury or death while driving is "highly likely" to occur at that level of intoxication. *See Wickman,* 908 F.2d at 1088. Indeed, Aetna identifies no evidence establishing any link between "some degree of impairment," or even increasing degrees of impairment, and increasing *probability* of death or injury. Instead, Aetna relies on the conclusory statement that "[t]he serious risks associated with driving while intoxicated are widely publicized." June 15, 1998, Denial Letter at 2, Joint Appendix at 48. However, the leap cannot be made from "serious risks," *i.e.,* the *possibility* of injury or death, that are "widely publicized" to the conclusion that a drunk driver knew or should have known that the consequences of driving while intoxicated are that he or she is "highly likely" to suffer injury or death, *i.e.,* the *probability* of injury or death. Thus, there is simply nothing in the evidence before Aetna in this case that would allow Aetna to make a finding that Mr. West's injury or death was "highly likely" to occur, let alone that he should have known that this was so. *See Farley,* 147 F.3d at 777 (the "substantial evidence" determination is made on the basis of evidence before the plan administrator).

Rather, all *evidence* is to the contrary. Mrs. West has submitted statistics com-

piled by the Federal Bureau of Investigation concerning alcohol-related offenses, of which the court took judicial notice without objection from Aetna. *See* Plaintiff's Exhibit 1 to Trial Brief.[8] Those statistics indicate that, for 1996, the year preceding Mr. West's fatal crash, there were 1,033,-000 arrests for driving under the influence of alcohol. *See id.* at 1. To the extent that "common knowledge" is helpful in evaluating this evidence, *see Miller*, 953 F.Supp. at 176–77, it should be plain that *not every intoxicated driver is arrested for driving under the influence of alcohol* in any given year, let alone every time he or she is intoxicated. However, for the same year, there were only 42,065 fatalities in motor vehicle crashes, and only 17,218 of those were alcohol-related, 40.9% of the total fatalities. Plaintiff's Exhibit 1 to Trial Brief at 2. Although alcohol was a factor in a significant percentage of fatalities, common sense and logic suggest that if it were indeed "highly likely" that a person driving while intoxicated would suffer a serious injury or be killed, the number of alcohol-related fatalities in 1996, in light of the number of arrests for driving under the influence, should have been vastly higher than 17,218. What "common knowledge" should actually tell a person driving while intoxicated is that he or she is far more likely to be arrested for driving while intoxicated than to die or be injured in an alcohol-related automobile crash, and far more likely to arrive home than to be either arrested, injured, or killed.

Aetna and the courts taking similar positions seem to read these or similar statistics "the wrong way round." Although one can reason that intoxication increases the risks of a fatal automobile death, where 40.9% of fatal automobile accidents involved alcohol, one cannot reason on the basis of this evidence that a drunk driver is therefore "highly likely" to suffer injury or death, even 40.9% of the time, or that any other expectation was unreasonable. *See Wickman*, 908 F.2d at 1088. While "common knowledge," drunk driving laws, public opprobrium, media publicity, and these statistics all demonstrate that driving drunk is irresponsible and dangerous, because the risks that come with it are preventable by the use of proper judgment, none of these things demonstrates that driving while intoxicated is so highly likely to result in injury or death that any other expectation is unreasonable. *Id.*

Indeed, the flawed reasoning of the various decisions upon which Aetna relies do suggest, as Mrs. West argues, a "moralistic" conclusion, not one based on "substantial evidence." While the court doubts that a insurer makes benefits determinations on a "moralistic" basis, the absence of "substantial evidence," indeed, any evidence, supporting Aetna's conclusion that Mr. West's death was highly likely to occur may indicate that financial self-interest may have undermined Aetna's duty to administer the UPS Plan "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). What the absence of "substantial evidence" in this case plainly does is demonstrate that Aetna's evaluation of the facts to determine the applicability of the UPS Plan was unreasonable, arbitrary, and capricious.

### D. Prejudgment Interest And Attorney's Fees

 The court notes that Mrs. West prayed for both prejudgment interest and attorney's fees, in addition to other

---

8. The court also believes that such statistics or similar ones would be well-known to the insurance industry, which has an obvious interest in such information. Thus, the court finds that Aetna either knew or should have known of this evidence at the time it denied Mrs. West's claim for accidental death benefits.

relief from Aetna's arbitrary and capricious refusal to pay accidental death benefits. Prejudgment interest is not available under ERISA absent a showing that a plan administrator has either breached ERISA's statutory obligations or the terms of the plan document. *See Jackson v. Fortis Benefits Ins. Co.*, 245 F.3d 748, 750 (8th Cir.2001) (affirming the district court's statement of the rule, based on 29 U.S.C. § 1132(a)(3)(B)); *see also Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 945 (8th Cir.1999) ("Prejudgment interest awards are permitted under ERISA where necessary to afford the plaintiff 'other appropriate equitable relief' under section 1132(a)(3)(B).") (citing *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1330–31 (8th Cir.1995)). In this case, the court has found that Aetna breached its fiduciary duty under ERISA by arbitrarily and capriciously denying benefits, and an award of prejudgment interest in this case is necessary to afford the plaintiff "other appropriate equitable relief," in light of the delay in payment of benefits on arbitrary and capricious grounds. Therefore, an award of prejudgment interest is appropriate.

Also, under the law of this circuit, there is a presumption in favor of awarding fees to a plaintiff who prevails in an ERISA action, absent special circumstances that would make an award unjust. *See, e.g., Martin v. Blue Cross and Blue Shield*, 270 F.3d 673 (8th Cir.2001) (citing *Landro v. Glendenning Motorways, Inc.*, 625 F.2d 1344, 1356 (8th Cir.1980)). Although the court must apply a five-factor test articulated in *Lawrence v. Westerhaus*, 749 F.2d 494, 495–96 (8th Cir.1984), to determine whether or not to award attorney fees, the factors must be evaluated in light of the presumption in favor of awarding attorney's fees to a prevailing plan participant or beneficiary. *Id.* Thus, "[a] proper consideration of the five factors will usually lead to the conclusion that a prevailing

plan participant or beneficiary should recover attorneys' fees. In those circumstances where it does not, merely finding that the five factors favor the Plan does not amount to special circumstances that would make an award unjust." *Id.* However, Northern District of Iowa Local Rule 54.2 provides the procedure and requirements for a post-judgment motion for an award of attorney's fees. N.D.IA.L.R. 54.2. Therefore, the court will consider Mrs. West's application for attorney's fees, under the applicable standards, upon posttrial motion pursuant to Local Rule 54.2.

### III. CONCLUSION

The court concludes that Aetna's benefits determination in this case cannot be upheld, either as to its interpretation of the meaning of "accident" in the UPS Plan or as to its evaluation of the facts to determine that Mr. West did not die of an "accident" in this case, and hence, the Plan is not applicable. All four of the *Finley* factors that are shown to be relevant in this case weigh *against* the reasonableness of Aetna's interpretation of "accident." Thus, even under the most deferential standard of review, Aetna's definition is "unreasonable," and hence, "arbitrary and capricious." However, even assuming that Aetna's definition is "reasonable," because it can be read as consistent with federal common law, Aetna's evaluation of the facts to determine the application of the Plan, as interpreted, is unreasonable, because it is not based on "substantial evidence."

Thus, Aetna breached its fiduciary duty by failing to pay Mrs. West's claim for accidental death benefits under the UPS Plan. Aetna shall pay the $67,000 in accidental death benefits due to Mrs. West under the UPS Plan, plus pre-judgment interest, from the date of Mr. West's death

until the date judgment is entered. **Judgment shall enter accordingly.**

**IT IS SO ORDERED.**